BOSTON ·EDISON COMPANY *vs.* DEPARTMENT OF PUBLIC
UTILITIES & another.[1]

Suffolk. January 6, 1994. - April 8, 1994.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Department of Public Utilities. Public Utilities*, Electric company, Con-
tract with nonutility generator. *Energy Facilities Siting Council. Ad-
ministrative Law*, Agency, Decision.

The Department of Public Utilities acted within its discretion and not ar-
bitrarily, capriciously or contrary to law, in determining that no truly
extraordinary circumstances existed to warrant its granting an excep-
tion to its regulations, where the electric company subject to the regula-
tions had not appealed from a previous decision in which the depart-
ment had, in fact, anticipated and taken into account the exact
circumstance (that the electric company would have a surplus future
generating capacity) the utility now claimed was extraordinary so as to
warrant relief. [464-465]
A matter was remanded for further proceedings before the Department of
Public Utilities, where the department's decision not to grant an excep-
tion to its regulations had failed to consider the issue whether an elec-
tric company's withdrawal of a proposal to construct a new generating
plant was a truly extraordinary circumstance warranting the exception
to the department's regulatory requirements that the electric company
sought. [465-466]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on July 15, 1993.

The case was reported by *Wilkins*, J.

*Douglas S. Horan* (*Roscoe Trimmier, Jr.*, with him) for
the plaintiff.

*Robert J. Munnelly, Jr.*, Assistant Attorney General, for
the defendant.

---

[1]Altresco Financial, Inc., intervener.

*John A. DeTore (Alan K. Posner* with him) for the intervener.

WILKINS, J. The plaintiff (Edison) has appealed (G. L. c. 25, § 5 [1992 ed.]) from a decision of the Department of Public Utilities (department), issued on June 25, 1993, in D.P.U. 92-130, in which the department rejected Edison's request to be relieved from a previously imposed requirement that it enter into a contract to purchase power from a nonutility generator. Edison argues that the department's decision must be set aside, asserting that, if implemented, that decision would impose an unnecessary financial burden on Edison and its customers because Edison has no need for an additional power source in the immediate future. The department responds that in its 1991 decision in D.P.U. 90-270 it concluded that Edison should proceed to seek a nonutility source of power and that, in its attempt to be relieved from that obligation, Edison has made no showing sufficient to justify reconsideration of the 1991 decision. A single justice of this court reported the case to the full court without decision.

This case involves the operation of two State regulatory processes conducted by separate agencies that shared a common concern: Edison's needs for electric power. The first of these regulatory processes concerns the department's implementation of certain aspects of the Federal Public Utility Regulatory Policies Act of 1978 (PURPA) (16 U.S.C. §§ 796 and 824a-3 [1988]), enacted to encourage the development of alternative power sources that would reduce the demand for fossil fuels. To encourage the development of a competitive market for alternative power generation, the department adopted regulations that require electric utilities to request project proposals from qualifying facilities for the furnishing of electric power pursuant to long-term, fixed-price contracts. See 220 Code Mass. Regs. §§ 8.00-8.07 (1986). Under the department's regulations, to be eligible for acceptance, any project proposal from a nonutility generator must be priced below the relevant utility's calculated long-term avoided costs of power, that is, the costs that the utility would incur in obtaining that power if the long-term contract

were not entered into with the nonutility generator. See 220 Code Mass. Regs. § 8.05 (3). PURPA refers to this as "the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a-3. Obviously, a utility's cost of additional power will vary depending on whether the utility can generate that power within its existing capacity or whether it must incur the expense of constructing new generating capacity. Just as obvious is the fact that the anticipated demand by a utility's customers for electric power will be a significant factor in determining the utility's perceived need for new generating capacity and, hence, in determining its avoided costs.

The appeal in this case arises from the effects of the regulatory process that we have just described. The department's 1991 decision, which we shall discuss in greater detail shortly, obliged Edison to proceed with a request for proposals which, in turn, led to Edison's selection of the intervener Altresco Financial (Altresco) as the qualifying facility with which Edison would contract for specific megawatts of power.

Edison's argument that there has been a significant change in circumstances relies on a decision made by the second regulatory agency concerned with Edison's power needs, the Energy Facilities Siting Council (council or siting council). At the times significant for our purposes, under G. L. c. 164, § 69I (1992 ed.), Edison was obliged to "file with the council a long-range forecast with respect to the electric power needs and requirements of its market area."[2] On May 1, 1990, Edison filed with the council its 1990 long-range demand forecast, supply plan, and a proposal to build a 306-megawatt electric generating facility. The council held public hearings over many days, received updated information, and

[2]Statute 1992, c. 141, effective September 1, 1992 (*id.* at § 55), changed the name and functions of the siting council and merged it into the department, but not under the department's control and supervision. The department, and not the council's successor, now has the obligation to review electric utility long-range forecasts. See G. L. c. 164, § 69I, as appearing in St. 1992, c. 141, § 12.

on April 10, 1992, issued a final decision in which it found that "Edison can be anticipated to experience a capacity surplus totalling 149 MW [megawatts] in 1996, and 120 MW in 1997."[3]

We now discuss the department's 1991 decision, the one that Edison argues the department should have agreed to reconsider and did not. The proceeding commenced on October 15, 1990, when Edison filed for approval of a proposed draft of its request for proposals from nonutility generators desiring to sell electric energy and capacity to Edison under a long-term contract pursuant to the procedures outlined in the department's regulations. In May, 1991, Edison moved that the department defer action on its proposal until the siting council acted on Edison's May 1, 1990, filing of its long-range plan with the council. Edison argued that the council might decide that whatever purchases of power the department might order would be unneeded and that the cost of the avoidable unit to be used in establishing the conditions of any request for proposals would depend on conclusions reached by the council.

In a decision issued on August 16, 1991, the department rejected Edison's request for delay but modified its normal process by establishing a range for the electrical capacity to be sought through Edison's requests for proposals. The department tentatively set the supply block at 306 megawatts, the capacity of Edison's then proposed plant, subject to adjustment by the department following the siting council's determination of Edison's needs. The department also set a minimum supply block of 132 megawatts, which was equal to 5% of Edison's current annual peak load. See 220 Code Mass. Regs. § 8.05 (2) (b). The department stated that this minimum supply block would be required even if the siting council should "find no need for [Edison] to bring any additional supply into service within the next 20 years." The de-

---

[3]The siting council's decision acknowledged the expected availability of power from a nonutility generator selected in response to the request for proposals but noted that there would be surpluses even without that new power source.

partment did not say, however, that, if Edison needed no additional supply, the cost of Edison's proposed new plant would cease to be the appropriate unit for determining avoidable costs for the purposes of accepting bids from qualifying facilities. The department in effect said that, if the bid price was right, Edison would have to purchase power and capacity from a nonutility generator, even if Edison did not need additional generating capacity. Edison did not appeal to challenge the requirement that it use the cost of its proposed new plant in determining the avoidable costs to be used as a price ceiling on bids to be submitted in response to its request for proposals. Nor did Edison appeal to challenge the requirement that, whatever its needs, if the bid price was right, Edison must enter into a contract with a nonutility generator for the purchase of at least 132 megawatts of power.

On January 27, 1992, the department decided that it should wait no longer for the siting council's decision on Edison's capacity needs and, in order to move the bidding process forward, fixed the supply block for Edison's request for proposals at the 132-megawatt minimum. In making that decision, the department stated that important regulatory objectives would be furthered and an opportunity would be created to make "a market comparison for [Edison's] proposed . . . facility." Once again Edison did not appeal from a decision which required it to proceed with soliciting proposals without regard to what the siting council might decide and which continued to point to the cost of Edison's proposed new plant as the benchmark against which the bids would be measured.

The siting council issued its decision on April 10, 1992, concluding that Edison would have excess capacity in 1996 and 1997. Edison then reacted by notifying the department, on April 30, 1992, that it was deferring its proposed new plant and by petitioning, on May 20, 1992, for a delay in the deadline for selecting the successful nonutility generator. Edison asserted that, in the circumstances, a contract with a nonutility generator would unnecessarily increase the cost of electricity to its customers by $237,000,000 and that the

council's decision and Edison's postponement of its proposed new plant made the pending request for proposals process "completely out of date." The company objected to the use of a ceiling price based on the costs of Edison's now deferred new plant. In support of its request to be exempted from seeking proposals from nonutility generators, Edison pointed to 220 Code Mass. Regs. § 8.07 (3), which states that "[t]he Department may, where appropriate, grant an exception from any provision of these regulations."

The department did not rule on Edison's request to defer its requests for proposals from nonutility generators for more than a year. On June 25, 1993, by a two-to-one vote, the department denied Edison's petition. The department treated Edison's request as a petition to terminate the process of requesting proposals.[4] The department recognized that its regulations permitted it to grant an exemption "where appropriate" and noted that it had previously required a party requesting an exemption from its regulations to demonstrate the existence of "truly extraordinary circumstances."

The department made its decision "based on information available as of the Company's May 20, 1992 petition" in this proceeding. The department thus refused to consider more recent information that Edison had submitted. The department observed that its 1991 decision had addressed many of the issues now raised and that it continued to believe that ratepayers would benefit "through competition in the electric generation market" which would lead to "least-cost investments with reduced regulatory oversight." The department noted that its 1991 decision had "explicitly provided for the possibility of a finding by the Siting Council that the Company had no need for additional resources" and had fixed a

---

[4] On June 1, 1992, Edison had identified the intervener Altresco as the sole nonutility generator selected pursuant to Edison's requests for proposals. On August 4, 1992, the department issued a stay suspending Edison's obligation to negotiate and execute a contract with Altresco until seven days after the department's decision on Edison's pending petition to defer the request for proposals process and for an exemption from the requirements of the department's regulations.

minimum supply block in such an event. For this reason the department said that it was "hard pressed now to accept a finding of no need by the Siting Council as constituting truly extraordinary circumstances that would justify terminating" the request for proposals process.

The department did not, however, discuss a change of circumstance that it had not anticipated in its 1991 decision, namely Edison's deferral, at least for the immediate future, of plans to construct a new plant. The department did not decide whether that change was truly extraordinary. The department's regulations required that the costs of any project proposal be below Edison's avoidable costs at the time that the department approved the request for proposals. 220 Code Mass. Regs. §§ 8.05 (2)-(3). The 1991 decision had accordingly treated the costs of Edison's proposed new plant as "the avoidable unit for the purpose of identifying the size and timing of the supply block, and for the purpose of calculating ceiling price schedules." In seeking a delay, Edison represented that its deferral of the proposed plant significantly altered the merits of its contracting with a nonutility generator.[5]

The department was warranted in construing its own regulation as providing that an exception to its regulations would be "appropriate," only when there were truly extraordinary circumstances. Because the department's 1991 unappealed decision had recognized the possibility that the siting council would conclude that Edison had no need for new capacity and had also determined that the department's objectives would be better served by encouraging the generation of power by nonutilities, the department was also warranted in concluding that the fact that Edison did not need new capac-

---

[5]Edison had submitted material in support of its initial request for delay that indicated that the ceiling price established for assessing bids of nonutility generators had been 10.18 cents per kilowatt hour during the period of the proposed contract and that, based on updated projections, the ceiling price would be 6.04 cents per kilowatt hour for the same period, well below the nonutility generators' bids that were in the range of eight to nine cents per kilowatt hour.

ity, even if true, was not a truly extraordinary circumstance. Whatever the new information disclosed about Edison's need for generating capacity in the near term, it did not contradict the department's previously expressed rationale for ordering the implementation of the request for proposals process. Events that unfold within the range of anticipated possibilities for which an agency has made provision need not be characterized as truly extraordinary. The department acted within its discretion and was not arbitrary or capricious, or acting contrary to law, when it decided that the absence of a need for new generating capacity was not a truly extraordinary circumstance.

We have, however, a different view of the department's unexplained failure to consider whether Edison's withdrawal, or at least deferral, of its proposed new plant, resulting in a contract price that was said to exceed avoided costs, was a truly extraordinary circumstance. The department said, because it had not "had opportunity to explore the data and assumptions behind that calculation," that it could not rely on Edison's claim that implementation of the department's requirement would unnecessarily cost Edison's customers $273,000,000. This statement is surprising because the department had had the matter before it for over a year. Equally surprising is the decision's failure to advert specifically to the consequences of Edison's withdrawal of its proposal to construct a new generating plant. This change may or may not be a truly extraordinary circumstance in the department's view. There is no way of telling on this record.

Edison was entitled to a reasoned decision on whether this new circumstance, which was not contemplated in the department's 1991 decision, warranted an exception to the department's regulatory requirements. The department failed to furnish an adequate statement of reasons for its decision on this point as it was obliged to do. See G. L. c. 30A, §§ 11 (8) (agency decision must have a statement of reasons) and 14 (7) (*g*) (reversal of agency decision appropriate when substantial rights may have been prejudiced by a decision not in accordance with law) (1992 ed.). Cf. *Massachusetts Auto.*

*Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 401 Mass. 282, 287-288 (1987).

A judgment should be entered in the county court that the decision of the department in D.P.U. 92-130 entered on June 25, 1993, is set aside and that the proceeding is remanded to the department for further consideration in light of this opinion.

*So ordered.*