MASSACHUSETTS ELECTRIC COMPANY *vs.* DEPARTMENT OF
PUBLIC UTILITIES (and a companion case[1]).

Suffolk. September 12, 1994. - December 22, 1994.

Present: LIACOS, C.J., WILKINS, ABRAMS, & LYNCH, JJ.

*Department of Public Utilities. Public Utilities*, Electric company, Con-
tract with nonutility generator, Environmental externality values. *Elec-
tric Company. Administrative Law*, Regulations. *Federal Preemption.*

The Department of Public Utilities, in exercising its regulatory function,
does not now have any statutorily delegated authority to consider the
over-all impact of pollution on society, and it acted in excess of its au-
thority to require electric utilities to select electric power sources based
on environmental considerations encompassing costs that would not oth-
erwise be borne by ratepayers; the matter was to be remanded to the
department for further consideration. [245-247]

This court declined at this time to determine whether the Federal Public
Utility Regulatory Policies Act of 1978 preempts the Department of
Public Utilities' integrated resource management regulations and rul-
ings concerning environmental externality values. [247-250]

CIVIL ACTIONS commenced in the Supreme Judicial Court
for the county of Suffolk on November 30, 1992.

The cases were reported by *Greaney*, J.

*Peter G. Flynn* for Massachusetts Electric Company.

*John A. DeTore* (*Alan K. Posner* with him) for National
Coal Association.

*Pierce O. Cray*, Assistant Attorney General, for Depart-
ment of Public Utilities.

*James K. Brown* (*Michael I. Joachim* with him) for the
intervener.

The following submitted briefs for amici curiae:

[1]National Coal Association *vs.* Department of Public Utilities.

*Mary E. Cotter & William S. Stowe* for Boston Edison Company.

*Philip M. Small*, of Connecticut, *& Stephen Klionsky* for Western Massachusetts Electric Company.

*Stephen S. Ostrach & Todd S. Brilliant* for Massachusetts Business Roundtable.

*Daniel W. Allegretti & Peter W. Brown*, of New Hampshire, for New England Cogeneration Association.

*Robert H. Russell, III*, for Conservation Law Foundation & others.

WILKINS, J. These consolidated appeals, before us on a single justice's reservation and report of challenges to an adjudicatory decision of the Department of Public Utilities (department), concern the lawfulness of certain conditions that the department has established for determining what source or sources an electric utility must select when seeking the generation of additional electric power. In general terms, the department requires consideration in the selection process of the consequences of the emission of various pollutants by alternative power sources that might be selected. In fixing what are described as environmental externality values, the department has attempted to reflect the impact of various pollutants in a monetary sense. The result of this process, therefore, could be that a potential source of power whose cost to the utility appears to be the lowest, when determined apart from environmental considerations, would lose its status as the lowest cost alternative because of its greater adverse impact on the environment, expressed in dollars and cents, than that of one or more alternative power sources.

The appellants, Massachusetts Electric Company (Mass. Electric) and National Coal Association (National Coal), argue that the department has exceeded its statutory authority by mandating consideration of environmental externality values in deciding on new power sources. National Coal argues that the department lacks statutory authority in any respect to direct a utility, in deciding among alternative power sources, to consider the relative environmental impact of alternative sources of electric generation. We reject this broad

challenge. Mass. Electric takes a less extreme position. It grants that the department may require a utility to select among potential new power sources based in part on the effect on the environment of those power sources if the environmental harm may have an effect on the utility's costs and hence on the rates to be paid by the utility's customers. Mass. Electric argues, however, that the department has no authority to require "electric utilities to select new resources based on environmental externality values that encompass costs that Massachusetts ratepayers would otherwise not incur."

Because we conclude that the department is not authorized to take environmental considerations into account to the degree it has in the decision under review, we accept the general thrust of Mass. Electric's argument and shall remand the matter to the department for further consideration. Our decision should not be construed as a disapproval of the department's underlying purpose to make environmental considerations, in the broadest sense, appropriate factors in the selection of electric generating sources. If the department is to use such considerations directly, however, the Legislature must grant that regulatory authority, as has been done in several other jurisdictions.[2] We shall return to the question of

---

[2]See, e.g., Ill. Compiled Stat. ch. 220, § 5/1-102 (1993) ("It is therefore declared to be the policy of the State that public utilities shall continue to be regulated effectively and comprehensively. It is further declared that the goals and objectives of such regulation shall be to ensure . . . (b) Environmental Quality: the protection of the environment from the adverse external costs of public utility services so that (i) environmental costs of proposed actions having a significant impact on the environment and the environmental impact of the alternatives are identified, documented and considered in the regulatory process; (ii) the prudently and reasonably incurred costs of environmental controls are recovered"); N.Y. Pub. Serv. Law § 5(2) (McKinney 1989) ("The commission shall encourage all persons and corporations subject to its jurisdiction to formulate and carry out long-range programs, individually or cooperatively, for the performance of their public service responsibilities with economy, efficiency, and care for the public safety, the preservation of environmental values and the conservation of natural resources").

the department's authority after we have set forth the background of the department's decision.

The department commenced this proceeding (D.P.U. 91-131) to determine whether the environmental externality values that it had established in 1990 (in D.P.U. 89-239) should be revised.[3] In that earlier proceeding the department determined that, in selecting new resources, an electric company must consider the environmental externalities that would be created by the resources under consideration. The department then established values for certain externalities associated with combustion-based generating plants. The department was acting under its rules regulating integrated resource management (IRM) practices which were designed "to ensure that competitive resource solicitations result in the selection of resources that are least cost to society."

The IRM process implements certain aspects of the Federal Public Utility Regulatory Policies Act of 1978 (PURPA) (16 U.S.C. §§ 796 and 824a-3 [1988]), which was enacted to encourage the development of alternative power sources that would reduce the demand for fossil fuels. See *Boston Edison Co.* v. *Department of Pub. Utils.*, 417 Mass. 458, 459 (1994). Under the department's regulations, electric utilities are required to request project proposals from qualifying facilities for the furnishing of electric power pursuant to long-term contracts. *Id.* A project proposal of a nonutility generator, to be eligible for acceptance, "must be priced [at or] below the relevant utility's calculated long-term avoided costs of power, that is, the costs that the utility would [otherwise] incur in obtaining that power." *Id.* at 459-460. The department concluded in its decision now before us that it was "imperative, when comparing bids in IRM resource solicitations, that the Department recognize the different environmental impacts of competing resources, including those that have complied with all applicable environmental

[3]This new proceeding was entitled "Investigation by the [department] on its own motion as to environmental externality values to be used in resource cost-effectiveness tests by electric companies subject to the Department's jurisdiction."

regulations." The department recognized "that including environmental externalities in resource selection decisions may result in some higher direct costs in the short-term" but that "environmental externalities are real costs borne by ratepayers and the rest of society in the form of increased health care expenses, economic impacts on material and agricultural resources, and a reduced quality of life." Increased costs, the department said, "will be mitigated by long-term economic benefits in the form of lower costs to comply with increasingly stringent environmental regulations, and lower costs associated with the impacts of pollution upon society."

One major area of contention before the department concerned the method by which environmental externality values would be determined. In its 1990 decision (D.P.U. 89-239), the department had used what has been called the implied valuation method, a method that does not directly value the financial impact of the effects of a pollutant but rather measures the costs of reducing the emission, or the effects of the emission, of the particular pollutant.[4] It seems to be generally agreed that in theory and logic the use of the damage valuation method would be the better approach, that is, determining "a set of comprehensive and accurate damage costs for all pollutants."[5] In its 1990 decision (D.P.U. 89-239), because of its perception that damage valuation was not then feasible, the department indicated that it would use the implied valuation method "as a proxy in the valuation of environmental damages," that is, "a reasonable proxy for what society as a whole is willing to pay to avoid damages from pollutant emissions." In its decision now on appeal, the

---

[4]These costs are those in excess of the costs that are currently incurred in mandated pollution prevention (and thus are already "internalized" or reflected in the resource's costs).

[5]Most electric utilities, nonutility generation interests, and the United States Department of Energy urged the department to adopt the damage valuation method. In contrast, Boston Gas Company (an intervener in this appeal), the Massachusetts Division of Energy Resources, the Attorney General, the Conservation Law Foundation, and the Massachusetts Public Interest Research Group urged the department to adopt the implied valuation method.

department adhered to its previous position, concluding that the proponents of change had not met what it saw as their burden of showing that a damage value for any specific pollutant was sufficiently comprehensive and reliable so as to warrant its adoption in lieu of the implied valuation method.

It is important to recognize that the range of considerations that the department treats as appropriate in valuing damage from pollution emissions is wide. The department's definition of comprehensive damage includes "human morbidity, mortality, and genetic effects; materials damage; agricultural productivity; and non-priced goods (*e.g.*, cultural, scenic and recreational value, visibility, damages to species and natural systems)." Certain of these damages are not measurable easily, if at all, in dollars and cents. Additionally, the scope of the department's definition of damage valuation is not limited to the effects of pollution in Massachusetts or even in this country.

The IRM process (using either the implied valuation or the damage valuation approach) does not cause pollution prevention costs or pollution damage costs to be specifically reflected in the electric rates paid by an electric utility's customers. The recognition of such costs in the selection of sources of electric generation pursuant to the IRM process may cause a particular potential electric generating resource to be rejected (because of the value attributed to its levels of anticipated pollution), but the consequence of that rejection is simply that a currently more costly alternative source, one that is perceived to be a less harmful polluter, will be selected and the electric utility, and ultimately its ratepayers, will pay more for electricity. Similarly, the noninternalized cost of pollution prevention of the facility selected, although a cost considered in making the IRM decision, will not itself be reflected in the utility's costs or rates. We shall return to the matter of increased costs and hence rates resulting from recognizing environmental externality values when we discuss National Coal's argument that PURPA preempts, and thus forbids, the department from using environmental exter-

nalities in its IRM procedures adopted to implement the Federal legislation.

The department exceeded its authority in requiring consideration in its IRM processes of environmental externality values that may not reasonably be expected to have an effect on a utility's costs and hence on the rates that its customers must pay. Without explanation, the department expressly excluded from consideration in its decision "[j]urisdictional questions about the Department's ability to require the incorporation of externalities in resource procurement decisions." It is not apparent that the department has explicitly ruled on this point in any earlier proceeding. We, therefore, are without the agency's interpretation of its governing statutes, and we need not give whatever judicial deference might be due to the department's construction of those statutes.

The department has broad authority to investigate and rule on the rates, prices, and charges of an electric company. G. L. c. 164, § 94 (1992 ed.). See *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 47, cert. denied, 439 U.S. 921 (1978). It has authority to issue orders relative to the rates, charges, and practices covered by contracts for sales of electricity by an electric company "as the public interest requires." G. L. c. 164, § 94. In considering rates, the department obviously has the authority to review the costs that will be reflected in them. The department also has "the general supervision" of electric companies. G. L. c. 164, § 76 (1992 ed.).[6]

Although it is uncontested that the department has no explicit statutory authority to consider environmental externalities for any purpose, the absence of an explicit provision is not conclusive. *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 75 (1979), and cases cited. The department has broad authority to promulgate regulations

[6]By G. L. c. 164, § 94G (1992 ed.), the department may investigate any "agreements, practices, and procedures" that exist between an electric company and any supplier of fuel to determine whether they are "in the best interest of the retail customers." The decision under review was not the result of such an investigation.

consistent with G. L. c. 164 and necessary to administer the statute. See *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 494 (1973). Specific authority to act in a particular respect does not bar other action that is consistent under general statutory authority. *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health, supra* at 76. Courts give special scrutiny to assertions of implied authority to issue regulations on a particular subject not within any broad grant of statutory authority to act. *Id.* at 75-77. "When we have found an implied authority to issue regulations, however, there has always been at least a rational relationship between the regulation and the purpose of the statute that we viewed as authorizing the regulation." *Life Ins. Ass'n of Mass.* v. *Commissioner of Ins.*, 403 Mass. 410, 417 (1988). The question is whether the department's attempt to reflect the broad effect of the emission of pollutants in its regulations is authorized by any statutory source. "An implication of authority cannot arise from a statutory vacuum." *Id.* at 418.

The department does not have responsibility for the protection of the environment. It has regulatory authority over an electric utility's rates, and reasonable costs to be incurred in protecting the environment, whether mandated or voluntary, may be reflected in a utility's approved rates. In its rate regulatory function, therefore, the department may direct the avoidance of conditions that a utility might experience, provided that reasonably anticipated future circumstances will impose costs on the utility that will be detrimental to the interests of ratepayers. Thus, if it reasonably appears that the current emission of a pollutant in lawful amounts will be affected in the foreseeable future by a prohibition, new restrictions, costly regulation, or pollution penalties or taxes, for example, the department has the authority as a rate regulator to consider the appropriateness of avoiding that reasonably foreseen change and requiring that the utility pursue a course likely to be less costly to ratepayers in the long term.

We, therefore, accept the department's conclusion that the acceptability of a potential provider of electric power should

be determined in part by the potential cost to the utility of that source's likely pollution of the environment. We agree that it is also appropriate to consider that the increased costs that will result from the selection of another power source "will be mitigated by long-term economic benefits in the form of lower costs to comply with increasingly stringent environmental regulations." Where we disagree with the department (as a matter of legal principle, but not as a matter of environmental policy) is in the department's conclusion that increased costs (and hence higher rates) are justified solely because of the potential or real effect of pollution on other than ratepayers, or, as the department put it, on "the rest of society in the form of increased health care expenses, economic impacts on material and agricultural resources, and a reduced quality of life." These are important subjects, but they lie in the jurisdiction of legislatures and those environmental (and rate) regulators to whom legislatures have delegated authority to act. The department does not now have delegated authority to consider the over-all impact of pollution on society in the course of carrying out its regulatory functions.[7]

Our conclusion that the department acted in excess of its statutory authority makes it unnecessary to consider several other issues raised by the appellants. Some of these issues appear not likely to be significant on remand and at least until such time as the department's statutory authority is increased. The department's future action may eliminate other issues from any subsequent challenge to a decision in this area. There is, however, one issue, not curable by department action or State legislation, that bears on the authority of the department to use monetized environmental externality values in resource procurement decisions. We consider that issue.[8]

---

[7]The department has not argued that the values that it has placed on the environmental externalities of pollutants reflect only reasonably foreseeable costs that utilities will incur.

[8]We mention one other issue. The department ordered this generic adjudicatory proceeding to consider whether it should adopt different environ-

National Coal, but not Mass. Electric, argues that Federal law preempts the department from considering monetized environmental externalities in deciding what resource or resources an electric utility should select as a new source of power. National Coal contends that PURPA, and regulations issued under it, limit the department under its IRM process to comparing a utility's "avoided cost" with the costs of prospective alternative power sources and that monetized environmental externality values have no place in the selection process. The argument appears to be that Federal law mandates that rates that are to be paid to certain nonutility generators, known as qualifying facilities, may not exceed the utility's "avoided" or "incremental cost." See 16 U.S.C. § 824a-3 (b) and (d). This ceiling is defined as the "cost to the electric utility" that it would have incurred in generating or purchasing equivalent power from another source. 16 U.S.C. § 824a-3 (d). National Coal argues that consideration of environmental externality values in the department's IRM procedures will reflect costs that are not permitted under Federal law.

We note initially that PURPA bars the Federal Energy Regulatory Commission (FERC) from providing "for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a-3 (b). The department's IRM regulations, of course, are not a rule of the Federal agency; they concern the process of selection of new

mental externality values from those then in effect. The department had the burden of meeting the standards of the administrative procedure act (G. L. c. 30A, § 11 [1992 ed.]), including the filing of an adequate statement of reasons for its decision, supporting findings of fact, and the presence in the record of substantial evidence to support its decision. The department was correct in ruling that the proponents of change had the burden of proving that change in one or more environmental externality values was appropriate or required. Rejection of the case made by the proponents of a change to the damage valuation process, however, would not alone be sufficient to justify the department's decision as to why the implied valuation process should be continued. In this generic proceeding there must be findings and evidence warranting the continuation of the implied valuation process. Incorporation of the record and findings in earlier proceedings could fulfil that requirement.

electric power sources; and they do not fix, or even involve, any rate charged to a customer for electric power. Whether what we have just said disposes of the preemption argument may be debatable.

It is not clearly established, however, that PURPA bars an electric utility from paying more than its avoided cost to a qualified facility providing power to the utility. State courts of last resort have divided on the issue. Compare *Consolidated Edison Co.* v. *Public Serv. Comm'n*, 63 N.Y.2d 424, 433 (1984) (PURPA does not preempt State regulation requiring electric utilities to purchase power from Federal qualifying facilities at a rate in excess of the avoided cost purchase rate required under PURPA), appeal dismissed, 470 U.S. 1075 (1985), with *Kansas City Power & Light Co.* v. *State*, 234 Kan. 1052, 1057 (1984) (State regulator may not require electric utility to purchase electricity from cogenerator at rate in excess of Federal regulated rate based on avoided cost). See also *Connecticut Light & Power Co.* v. *South E. Conn. Regional Resources Recovery Auth.*, 822 F. Supp. 888, 891 (D. Conn. 1993) (declining to answer question and referring it to FERC under doctrine of primary jurisdiction). FERC itself has not taken a firm and final position on the issue. In *Orange & Rockland Utils., Inc.*, 43 F.E.R.C. par. 61,067, at 61,195 (1988), FERC abandoned an earlier position and announced that "it is no longer appropriate for states to impose rates exceeding avoided cost." That decision was stayed two months later, *Orange & Rockland Utils., Inc.*, 43 F.E.R.C. par. 61,547, at 62,361 (1988), and the matter appears to be unresolved to this day.

We see no reason to decide the preemption issue against the department. Subsequent Federal legislative and regulatory requirements may resolve the point. On remand, the department may wish to explain its position on this issue. In any event, National Coal has not demonstrated that the department's requirement that monetized environmental externalities must be considered means that the rates to be paid to a qualifying facility selected pursuant to the department's IRM procedures will always be invalid by reason of preemp-

tion. The rate paid to such a facility in a given circumstance may be no greater than the incremental cost to the utility and, if so, the rates would be permissible even under National Coal's preemption challenge. Moreover, in determining avoidable costs to the extent practicable, non-monetary factors are to be considered, such as the availability of energy during peak periods. 18 C.F.R. § 292.304 (e) (1988). There is thus no way to determine at this time that PURPA preempts the department's IRM regulations and rulings concerning environmental externality values, even under National Coal's view of the issue.

Because the department's decision reflected the value of environmental externalities beyond the range of its statutory authority to do so, a judgment should be entered in the county court vacating the department's decision and remanding the matter to the department for such further consideration as it deems appropriate.

*So ordered.*