BOSTON EDISON COMPANY *vs.* DEPARTMENT OF PUBLIC
UTILITIES & another.[1]

Suffolk. January 12, 1995. - March 16, 1995.

Present: LIACOS, C.J., WILKINS, LYNCH, & GREANEY, JJ.

*Department of Public Utilities. Public Utilities*, Electric company, Con-
tract with nonutility generator. *Energy Facilities Siting Board. Admin-
istrative Law*, Agency, Decision.

A matter was remanded for further proceedings before the Department of
Public Utilities for the department to reopen its proceedings to receive
and consider evidence on the issue whether an electric company's defer-
ral of construction of a new generating plant and resulting impact on
avoided costs was a truly extraordinary circumstance warranting an ex-
ception to the department's regulatory requirements as sought by the
electric company. [746-749]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on October 7, 1994.

The case was reported by *Lynch*, J.

*Roscoe Trimmier, Jr. (Michael S. Sher & Douglas S.
Horan* with him) for the plaintiff.

*Robert J. Munnelly, Jr.*, Assistant Attorney General, for
Department of Public Utilities.

*John A. DeTore (Alan K. Posner* with him) for the
intervener.

*Sheldon B. Kovitz*, for Point of Pines Beach Association,
Inc., amicus curiae, submitted a brief.

GREANEY, J. After our decision in *Boston Edison Co.* v.
*Department of Pub. Utils.*, 417 Mass. 458 (1994) (*Boston
Edison I*), in which we set aside the decision of the Depart-

---

[1]JMC Altresco, Inc. (formerly known as Altresco Financial, Inc.),
intervener.

ment of Public Utilities (department) in D.P.U. 92-130, and remanded the proceeding for further consideration, the plaintiff, Boston Edison Company (Edison), moved to reopen the evidentiary record before the department. Edison appealed (G. L. c. 25, § 5 [1992 ed.]) from the department's decision after remand in D.P.U. 92-130-B to deny the motion to reopen and to reaffirm its determination that Edison's deferral of its proposed 306-megawatt electric generating plant was not a "truly extraordinary circumstance" warranting an exception from its regulations. A single justice of this court reported the case to the full court without decision.

Edison argues that the department's remand decision should be set aside, contending that, because the department failed to receive evidence as to whether deferral of the proposed generating plant would unnecessarily cost ratepayers $290,000,000, the department's order requiring Edison to fulfil a previously imposed obligation to enter into a twenty-year contract to purchase 132 megawatts of power from the intervener, JMC Altresco, Inc. (Altresco), was unsupported by the record.[2] The department responds that its conclusion that Edison's deferral of the proposed generating plant was not a truly extraordinary circumstance was supported by evidence in the existing record which demonstrated that the

---

[2]The contract was to be fulfilled by Altresco's construction, through Altresco Lynn, Inc., of a gas-fired cogeneration 170-megawatt power facility at the General Electric Works in Lynn. In *Point of Pines Beach Ass'n* v. *Energy Facilities Siting Bd., ante* 281 (1995), this court vacated a decision of the Energy Facilities Siting Board (siting board) that there was need for the Lynn project beginning in the year 2000, concluding that the siting council could not rely upon approved (future) power purchase agreements to demonstrate the existence of need in the Commonwealth for the power. As to the problem before us the court stated the following: "Boston Edison Company was ordered by the department to proceed with a request for proposals, which led to the Altresco proposal that was ultimately approved. Boston Edison is thus faced with entering into the power purchase agreement with Altresco by compulsion and without reference to market forces. Claiming that it has no need for additional energy, Boston Edison has contested the department's mandate that it purchase it, *Boston Edison Co.* v. *Department of Pub. Utils.*, 417 Mass. 458 (1994), and continues to contest that mandate by appealing the board's decision after remand. That appeal is now before this court." *Id.* at 286-287.

deferral of the proposed generating plant was an anticipated consequence for which provision had been made, and that, because Edison, in any event, has been found to need at least a minimum of additional power capacity, ratepayers would not be burdened with unnecessary charges. Altresco also argues that the department did not deviate from the order of remand in *Boston Edison I,* that the department was not required to reopen the record, and that the department had adequate reasons for concluding that Edison's deferral of the proposed generating facility did not amount to a truly extraordinary circumstance.

We conclude that the department's decision in D.P.U. 92-130-B is not adequately supported by the existing record, and, therefore, we set aside that decision and remand the case to the department with instructions to reopen the record to consider new evidence as to whether, in view of Edison's deferral of its proposed generating plant, requiring it to purchase power from Altresco would result in excessive charges to ratepayers.

As we explained in *Boston Edison I,* the department, pursuant to the Federal Public Utility Regulatory Policies Act of 1978 (PURPA) (16 U.S.C. §§ 796 and 824a-3 [1988]), which was enacted to encourage the development of alternative energy sources that would reduce the demand for fossil fuels, adopted regulations requiring electric utilities to request project proposals from qualifying facilities for the furnishing of electric power through long-term, fixed-price contracts. See 220 Code Mass. Regs. §§ 8.00-8.07 (1986). Under these regulations, to be eligible for acceptance, any project proposal from a nonutility generator must be priced below the relevant utility's "avoided costs," which are the costs that the utility would incur in obtaining that power if the long-term contract were not entered into with the nonutility generator. See 220 Code Mass. Regs. § 8.05 (3). A utility's costs depends on whether it needs new generating capacity to meet those power requirements.

The following is a synopsis of the pertinent facts concerning Edison's involvement in this regulatory scheme from

which the present appeal arises.[3] On October 15, 1990, Edison submitted for approval a draft request for proposals (RFP 3) from nonutility generators desiring to sell it electric power under long-term contracts pursuant to the procedures in the department's regulations. In D.P.U. 90-270, issued on August 16, 1991, the department denied Edison's request to defer the RFP 3 proceedings until the Energy Facilities Siting Council (siting council) addressed whether Edison had a long-range need for power.[4] In addition, the department set a minimum supply block of 132 megawatts, which was equal to 5% of Edison's current annual peak load, stating that this minimum supply block would be required even if the siting council should "find no need for [Edison] to bring any additional supply into service within the next 20 years."

The department subsequently ruled that the "ceiling price," which was the price against which the RFP 3 contract was to be measured, would continue to be based on the costs associated with Edison's proposed generating plant. On April 10, 1992, the siting council concluded that Edison would have excess capacity totalling 147 megawatts in 1996 and 118 megawatts in 1997. Edison responded to this decision by announcing, on April 30, 1992, that it was deferring its proposed generating plant and by moving, on May 20, 1992, for a delay in the deadline for selecting the successful nonutility generator. In its petition to defer RFP 3, Edison objected to the use of a ceiling price based on the costs associated with the now deferred plant. Edison asserted that the contract with the nonutility generator, in light of the siting council's finding of no immediate need, would unnecessarily increase the cost of electricity to its customers by

---

[3]*Boston Edison I, supra,* contains a more detailed summary of this process.

[4]Under G. L. c. 164, § 69I (1990 ed.), Edison was obliged to "file with the siting council a long-range forecast with respect to the electric power needs and requirements of its market area." The department, and not the council's successor (St. 1992, c. 141, § 55, changed the name and functions of the siting council and merged it into the department, but not under the department's control and supervision) now has the obligation to review electric utility long-range forecasts. See St. 1992, c. 141, § 12.

$273,000,000.[5] These circumstances, Edison maintained, justified an exception from the department's regulations governing power purchases. See 220 Code Mass. Regs. § 8.07 (3) ("The Department may, where appropriate, grant an exception from any provision of these regulations").

The department's decision in D.P.U. 92-130 denying deferral, issued on June 25, 1993, recognized that it had previously required a party seeking an exception from its regulations to demonstrate the existence of "truly extraordinary circumstances." (We indicated in *Boston Edison I, supra* at 464, that "[t]he department was warranted in construing its own regulation as providing that an exception to its regulations would be 'appropriate,' only when there were truly extraordinary circumstances.") Furthermore, in its decision which was the subject of the appeal in *Boston Edison I*, the department refused to consider more recent information that Edison had submitted and ordered Edison to proceed with RFP 3. The department explained that, because it had provided for the possibility of a finding by the siting council that Edison had no need for additional resources by fixing a minimum supply block, it was "hard pressed now to accept a finding of no need by the Siting Council as constituting truly extraordinary circumstances that would justify terminating" the request for proposals process. The department, however, did not discuss whether Edison's deferral of its proposed new plant might have such a significant impact on the figures used to calculate avoided costs that this would constitute a truly extraordinary circumstance warranting an exception from the department's regulations.

In *Boston Edison I*, we stated that, because the department had recognized the possibility that the siting council would conclude that Edison had no need for new capacity and had also determined that the department's objectives would be better served by the continued implementation of

---

[5]Subsequently, in its offer of proof in support of its motion to reopen the record after the department's decision in D.P.U. 92-130, Edison updated its previous forecasts, claiming that RFP 3 would unnecessarily cost ratepayers an excess of $290,000,000 over the life of the contract.

the request for proposals process, the department was warranted in concluding that a finding of no need was not a truly extraordinary circumstance. *Id.* at 464-465. We said: "Whatever the new information disclosed about Edison's need for generating capacity in the near term, it did not contradict the department's previously expressed rationale for ordering the implementation of the request for proposals process. Events that unfold within the range of anticipated possibilities for which an agency has made provision need not be characterized as truly extraordinary." *Boston Edison I*, *supra* at 465.

We took a different view, however, of the department's failure to consider whether Edison's deferral of its proposed generating plant was a truly extraordinary circumstance.[6] We noted that, with no discussion of the consequences of Edison's deferral, there was no way of telling from the record whether this unanticipated circumstance was truly extraordinary. *Id.* Because "[t]he department failed to furnish an adequate statement of reasons for its decision," that a truly extraordinary circumstance did not exist, see G. L. c. 30A, § 11 (8) (agency decision must have a statement of reasons), and § 14 (7) (*g*) (reversal of agency decision appropriate when substantial rights may have been prejudiced by a decision not in accordance with law) (1992 ed.), we set aside the department's decision in D.P.U. 92-130 and remanded the proceeding "to the department for further consideration in light of this opinion." *Id.* at 465-466.

We now discuss the department's decision after remand in D.P.U. 92-130-B, which is the subject of Edison's current appeal. After our decision in *Boston Edison I*, Edison, on May 31, 1994, moved to reopen the record to present evidence that the price of the RFP 3 contract, in light of the deferral of the proposed generating plant, would greatly exceed

---

[6]The department stated that, because it had not "had the opportunity to explore the data and assumptions behind that calculation," it could not rely on Edison's assertion that requiring it to purchase power from Altresco "would unnecessarily cost Edison's customers $273,000,000." *Boston Edison I, supra* at 465.

Edison's now much-reduced avoided costs. On June 23, 1994, Edison, at the hearing held on its motion, made an offer of proof indicating the type of updated information on avoided costs that it would submit if the record were reopened. On September 16, 1994, the department, by a two-to-one vote of its commissioners, denied Edison's motion, finding that the existing record was sufficient to support its conclusion that the consequences of the deferral of the proposed generating facility did not constitute a truly extraordinary circumstance. Thus, the department again ordered Edison to continue with the request for proposals process.

The department furnished three reasons in support of its determination that the deferral of the plant was not truly extraordinary. First, the department asserted that the deferral of a proposed generating plant is the anticipated consequence of the selection of a lower cost energy source through the request for proposals process. "If the company is able to meet all of its projected capacity needs with power from diversified [nonutility generator] sources . . . the Department would not likely allow the company to recover from ratepayers the costs of constructing the utility's own project." See 220 Code Mass. Regs. § 9.03 (1) (c) (department approval of new electric facility depends, in part, on demonstration by utility of net economic benefits to ratepayers over life of facility).

Second, the department stated that Edison's deferral of its proposed generating plant had no consequences for the cost-effectiveness of Altresco's winning RFP 3 bid because the department's regulations do not permit the recalculation of a utility's avoided costs after a successful solicitation. At the option of the nonutility generator, PURPA allows for calculation of avoided costs as of the time the nonutility generator incurs an obligation to supply power to a utility. 18 C.F.R. § 292.304 (a) (5) (1980). In order to lend stability to, and to encourage participation in, the request for proposals process, the department's regulations provide that the ultimately successful nonutility generator incurs a binding obligation when it first submits a bid to supply power at a certain price. 220

Code Mass. Regs. § 8.05 (6). Therefore, according to the department's decision in D.P.U. 92-130-B, "once a ceiling price is approved and an RFP issued, the inevitable changes in an electric company's avoided costs are no longer relevant to the RFP."

Third, the department attacked what it claimed were "deficiencies" in Edison's calculation of the $273,000,000 figure. Specifically, the department stated that Edison's projection of its reduced avoided costs, which compared Edison's costs "with RFP 3" and "without RFP 3," was based on the mistaken premise that, because Edison has no need for power, it would not have to incur additional capacity costs in the near future. In the department's view, because the siting council assumed that "an RFP 3 unit" would be completed, and that Edison would implement substantial load management programs that it subsequently abandoned, the siting council's "decision does reveal need for capacity from RFP 3."[7] In effect, the department stated that an exception to its regulations was not warranted because Edison's "without RFP 3" analysis was not supported by "persuasive evidence [that] clearly established that no new capacity would be needed for a major portion of the 20-year contract period" with Altresco.[8] The department also concluded that Edison's analysis of the costs associated with the purchase of power from

---

[7]During its investigation of Edison's resource needs, the siting council requested that Edison recalculate its load forecast. Edison filed the updated information, as well as a new plan to reduce its load management programs. The siting council stated, however, that Edison filed the new plan too late to be reviewed, and that it would have to be assessed at a later date. The department maintains that Edison's new plan would increase its need to secure additional power supplies by 179 to 199 megawatts annually.

[8]The department explained in its decision that a company's need for additional capacity is calculated as the difference between customers' peak demand and the capability of its existing resources to respond to that demand. Because a company's capability would remain constant in the absence of capacity additions or deletions, the department concluded that, to the extent that Edison understated its need for additional capacity, it also understated its customer peak demand requirements, and thus its costs in the "without RFP 3" analysis.

Altresco, in comparison to the costs (if any, in view of Edison's assertion of no need), of obtaining power from other sources, rested on "inconsistent cost comparisons." In sum, without holding a hearing or taking evidence, the department concluded that Edison's analysis was of "dubious quality" and, consequently, that further investigation of avoided costs was not warranted.[9]

In our view, the department still has not provided a satisfactory explanation of why Edison's deferral of its proposed generating plant, and the possible resulting impact on avoided costs, is not a truly extraordinary circumstance. Edison must accept the department's determination that its claimed lack of need for new generating capacity was not a truly extraordinary circumstance. As we explained in *Boston Edison I*, the finality of that determination stems from the unappealed 1991 decision setting a minimum supply block of 132 megawatts, which, the department stated, "would be required even if the siting council should 'find no need for [Edison] to bring any additional supply into service within the next 20 years.'" *Id.* at 461.

We do not agree that the department's order setting a minimum supply block of 132 megawatts reflected a determination that, despite a finding of no need by the siting council and the deferral of Edison's proposed generating plant, the ceiling price would and should continue to be the cost of the proposed facility. As we noted in *Boston Edison I*, by setting the minimum supply block, "The department in effect said that, *if the bid price was right*, Edison would have to purchase power and capacity from a nonutility generator, even if Edison did not need additional generating capacity" (emphasis added). *Boston Edison I, supra* at 462. The record does not establish that the department ever considered whether the costs of Edison's proposed generating plant

---

[9] The department also observed that the delay in constructing the Altresco plant as a result of this and other proceedings would reduce the alleged excess costs of purchasing power from Altresco, because the siting council found that Edison had "no need" for additional generating capacity only for the early years of the contract.

would continue to be the appropriate measure for determining avoided costs for purposes of the request for proposals.

Edison asserts with plausibility that the deferral of its proposed generating plant will have a substantial impact on the cost to it of meeting its need for power, and that it can establish to the department's satisfaction that the costs associated with the purchase of power from Altresco greatly exceed available alternatives. In substance, Edison contends that the compelled contract with Altresco will result in a multi-million dollar cost to ratepayers which it now quantifies at $290,000,000. It is not an adequate response to this claim that, once a nonutility generator submits a bid to supply power and a ceiling price is assigned, the inevitable changes in an electric company's avoided costs are no longer relevant.[10] As a practical matter, we appreciate the futility of attempting to fix, with absolute certainty, avoided costs at any time before actual delivery. We also appreciate the department's interest in lending stability to the solicitation process. The department itself acknowledged in D.P.U. 92-130-B, however, that an exception from its regulations might be appropriate if, after approval of an initial ceiling price, there is evidence that conclusively establishes that there is no need for additional capacity. It would seem that an exception from regulations also might be warranted if it appears that a utility's avoided costs have diminished substantially prior to the signing of an enforced contract with a nonutility generator.[11] Certainly, in a case like this, the public interest would not be served by the enforcement of a costly long-term contract if the department has available to it information which, if ac-

---

[10]We are presently not concerned with whether it is permissible under PURPA for the department to conclude that a ceiling price cannot be adjusted during the solicitation process in order to reflect a utility's fluctuating avoided costs.

[11]According to the dissenting commissioner, the fact that the RFP process generally relies on avoided costs fixed at the outset of the process has resulted in the substitution of an alternative process which does not rely on avoided costs.

curate, establishes that the Altresco contract may result in unnecessary costs for ratepayers.

In *Boston Edison I,* we held that the department had not provided a reasoned decision on this issue, and that is why we remanded the proceeding for further consideration. In view of the department's decision after remand we still are not able to determine whether (a) Edison's data supports its assertion that, due to changed circumstances, the cost of the Altresco contract is now excessive; and (b) if this is so, whether this fact would constitute a truly extraordinary circumstance warranting an exception to the department's regulations. In the absence of a hearing and record findings, the department's bald contention that Edison's submissions are deficient for purposes of demonstrating reduced costs is unconvincing. The department previously has stated that "because it had not 'had opportunity to explore the data and assumptions behind that calculation,' . . . it could not rely on Edison's claim that implementation of the department's requirement would unnecessarily cost Edison's customers $273,000,000." *Boston Edison I, supra* at 465. Those data and assumptions remain unexplored.[12] The department should evaluate Edison's contention that, because there is no longer a need for the capacity of either the deferred generating plant or RFP 3, the appropriate avoided cost against which the ceiling price must be calculated is Edison's next most expensive capacity, and not the deferred project. "The department's right to utilize its 'technical competence and specialized knowledge in the evaluation of the evidence' (G. L. c. 30A, § 11 [5]) may be reflected in the specific findings; it does not make specific findings unnecessary." *Hamilton* v. *Department of Pub. Utils.,* 346 Mass. 130, 137

---

[12]The dissenting commissioner noted: "While admonishing [Edison] and Altresco for the attempted introduction of extra-record information, the majority has repeatedly refused to allow [Edison] to submit supportive data on the excessive costs of RFP3 to ratepayers. . . . Even if $273 million is not the correct figure (and it may be even higher now), the Department has not explored the cost of RFP3, and is committing [Edison's] ratepayers to pay an as yet undetermined amount."

(1963). We shall not assume that there was an adequate explanation for the department's action. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 401 Mass. 282, 288 (1987).

We have traditionally accorded wide latitude to an administrative agency's evidentiary rulings. " '[U]nless the admission [or exclusion] of the evidence resulted in a denial . . . of substantial justice,' the appellants have no valid complaint." *Sudbury* v. *Department of Pub. Utils.*, 351 Mass. 214, 220 (1966), quoting *Mayor of Everett* v. *Superior Court*, 324 Mass. 144, 148 (1949). In this case, however, "we are precluded . . . from determining if the exclusion of the evidence deprives the plaintiffs of substantial justice" because the record does not afford us the opportunity to evaluate the department's decision that Edison's reduced avoided costs do not merit an exception to its regulations. *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, *supra* at 287. The department "should not leave counsel and the courts without the guidance of proper findings . . . to determine from a voluminous record . . . whether [its] conclusions can be sustained on the evidence." *Insurance Rating Bd.* v. *Commissioner of Ins.*, 359 Mass. 111, 118 (1971). See *Hamilton* v. *Department of Pub. Utils.*, *supra*. We are persuaded that it is necessary for the department to reopen the record so that it can receive and consider evidence whether the deferral of Edison's proposed generating plant has resulted in a contract price well in excess of avoided costs.

We accordingly vacate the decision of the department in D.P.U. 92-130-B, and remand the proceeding to the department for further consideration of evidence from Edison and the other parties in light of this opinion.

*So ordered.*