PLYMOUTH ROCK ENERGY ASSOCIATES *vs.* DEPARTMENT OF
PUBLIC UTILITIES & another.[1]

Suffolk. February 8, 1995. - April 26, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Department of Public Utilities. Public Utilities,* Contract with nonutility
generator, Electric company, Judicial review. *Federal Public Utility
Regulatory Policies Act. Administrative Law,* Judicial review. *Words,*
"Avoided cost."

The Department of Public Utilities acted within its authority in concluding
that certain superseded 1986 regulations did not apply to the setting of
rates at which a utility was required to purchase electric power in 1992
from a small nonutility cogeneration power production facility under
the applicable regulatory scheme of integrated resource management
set forth in 220 Code Mass. Regs. § 10.00 (1990). [173-175]

A matter was remanded for further proceedings before the Department of
Public Utilities for further consideration in light of the requirements of
the Federal Public Utility Regulatory Policies Act of 1978 (PURPA)
(16 U.S.C. §§ 796 and 824a-3 [1988]) of the appropriate contract rate
at which a public utility must purchase electric power from a qualifying
small nonutility cogeneration power production facility. [175-177]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on March 14, 1994.

The case was reported by *O'Connor,* J.

*Steven Ferrey* for the plaintiff.

*Robert J. Munnelly, Jr.,* Assistant Attorney General, for
Department of Public Utilities.

*Eric J. Krathwohl* (*Robert P. Snell* with him) for Com-
monwealth Electric Company, intervener.

GREANEY, J. The plaintiff, Plymouth Rock Energy Associ-
ates (PREA), has appealed (G. L. c. 25, § 5 [1992 ed.])

---

[1]Commonwealth Electric Company, intervener.

from a decision of the Department of Public Utilities (department), issued on February 18, 1994, in D.P.U. 92-122, which set the price at which the intervener, Commonwealth Electric Company (Commonwealth) is required to purchase power from PREA, a small power producer, pursuant to the department's integrated resource management regulations (IRM), 220 Code Mass. Regs. § 10.00 (1990). PREA argues that the decision violates the department's regulations and administrative decisions and also violates requirements of the Federal Public Utility Regulatory Policies Act of 1978 (PURPA) (16 U.S.C. §§ 796 and 824a-3 [1988]). The department and Commonwealth respond that the department properly construed its own IRM regulations in setting the price for PREA's contract with Commonwealth, and that PREA's arguments asserting a conflict between the department's decision and PURPA should be rejected. A single justice of this court reported the case to the full court without decision.

The regulatory and factual background of this case is summarized as follows.[2] PURPA was enacted to encourage the development of alternative power and cogeneration resources by nonutility power generators thereby reducing the demand for fossil fuels. Under PURPA, if a power generation project meets certain specified requirements, it is characterized as a Qualifying Facility (QF). 16 U.S.C. § 796 (18) (B). PURPA requires that the Federal Energy Regulatory Commission (FERC) establish regulations that obligate public utilities to sell electric energy to and purchase power from QFs. 16 U.S.C. § 824a-3 (a). PURPA also specifies that the rates established by FERC for these purchases may not exceed the "incremental cost" to the utility of purchasing alternative electric energy. 16 U.S.C. § 824a-3 (b). This "incremental cost" is defined as "the cost to the electric utility of the elec-

[2]Other cases having relevance to the problem before us are *Boston Edison Co.* v. *Department of Pub. Utils.*, 419 Mass. 738 (1995); *Point of Pines Beach Ass'n* v. *Energy Facilities Siting Bd.*, 419 Mass. 281 (1995); and *Boston Edison Co.* v. *Department of Pub. Utils.*, 417 Mass. 458 (1994).

tric energy which, but for the purchase from such [QF], such utility would generate or purchase from another source." 16 U.S.C. § 824a-3 (d).

PURPA's implementing regulations, 18 C.F.R. Part 292 (1994), require that utilities purchase power from QF's at the utility's full "avoided cost" rate. 18 C.F.R. § 292.304 (d). "Avoided costs" are defined as a utility's incremental costs of purchasing alternative electric energy.[3] 18 C.F.R. § 292.101 (b) (6). See *American Paper Inst.* v. *American Elec. Power Serv. Corp.*, 461 U.S. 402, 412-418 (1983) (upholding requirement that QFs receive full avoided costs rate). Thus, in essence, the statutory ceiling price has become the floor price. Although FERC's regulations provide guidelines for the calculation of avoided costs, 18 C.F.R. § 292.304 (e), FERC has granted the States flexibility in implementing rates for purchase and, specifically, determining avoided costs. See *Southern Cal. Edison Co.*, 70 F.E.R.C. par. 61,666, at 61,675 (1995) (Federal commission gives States wide latitude in implementing PURPA in recognition of role Congress intended to give to States). See also Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214, 12,226 (1980) (codified at 18 C.F.R. Part 292).

The department's IRM regulations (220 Code Mass. Regs. § 10.00) were promulgated in 1990 to govern the planning, solicitation, and procurement of new and additional resources by investor-owned electric utilities such as Commonwealth from small power producers and cogenerators which qualify as QFs. The IRM regulations replaced the department's QF

---

[3]Avoided costs include both energy costs and capacity costs. See 18 C.F.R. § 292.101 (b)(6) (1994). The energy component refers to the fuel and variable operating and maintenance costs incurred by the utility to produce electricity. The capacity component refers to capital costs, fixed operating and maintenance costs, and other costs the utility would incur if it were required to construct a new generating facility. See Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities, and Interconnection Facilities, Fed. Energy Reg. Comm'n Rep. (CCH) par. 32,457, at 32,157 (1988).

regulations. 220 Code Mass. Regs. § 8.00 (1986). Under the QF regulations, utilities had to conduct periodic competitive solicitations under which QFs could respond to a request for proposals (RFP) by submitting bids to sell specified amounts of energy or capacity to the utility under long-term contracts. 220 Code Mass. Regs. § 8.05. Acceptable bids under this process led to the establishment of an "Award Group" from which the utility was obliged to select, and contract with, a supplier. 220 Code Mass. Regs. § 8.05 (6). Under the new IRM regulations, cogenerators and small power producers submit bids for the fulfilment of a utility's resource needs, the utility eventually designates a "proposed award group" from among the bids submitted, and the department, after a hearing, approves and designates a "final award group." 220 Code Mass. Regs. § 10.04 (3) (f). 220 Code Mass. Regs. § 10.05 (4) (a). There is an exception to the procedure for a small power producer with a proposed project not exceeding five megawatts (MW) whereby the producer may enter into a long-run standard contract B (not to exceed twenty years) without participating in the solicitation process. The exception is set out in 220 Code Mass. Regs. § 10.07 (1), which specifies that the contract price for such a project shall be "equivalent in value, on a present worth basis, to the weighted average stream of contractually-set prices paid to all of the project developers from the most recent final award group."

PREA, a limited partnership, is the developer of a five MW cogeneration power production facility adjacent to a regional shopping mall in Kingston. PREA's project will produce steam for heating and cooling the mall and electricity for sale to the utility grid. PREA made contact with Commonwealth in early 1992 to sell electricity to Commonwealth under a long-run standard contract B. When Commonwealth disputed any obligation to enter such a contract with PREA, these proceedings were commenced at the department. The department found that PREA's project fell within the exception for projects of five MW or less and would be governed by the provisions of § 10.07 (1). Because the IRM regula-

tions had recently become effective, and because Commonwealth had not by then had a "final award group" under the IRM regulations, the question arose as to how to establish a contract price.[4] (The IRM regulations did not address this point.) PREA maintained that the department should employ the price for Commonwealth's last "award group" under the predecessor QF regulations (RFP 2 price). Commonwealth resisted this approach. The department determined that, because Commonwealth had no current need for additional capacity until 2001, the contract price should be set at Commonwealth's short-run energy purchase rate for the first quarter of 1992, which does not include any capacity payments throughout the twenty-year contract term. (This is a rate of 2.7 cents per kilowatt hour. *Commonwealth Elec. Co.*, D.P.U. 91-31, at 5 [1992].) The pertinent portion of the department's decision on this issue is set forth below.[5] PREA then pursued this appeal.

---

[4]The department found that the IRM regulations, by their terms, became effective as to Commonwealth as of the date of its first filing under the regulations, which occurred on November 15, 1991. 220 Code Mass. Regs. § 10.01 (c) (1990). PREA's first contact with Commonwealth came after that date. At the time of initial contact, Commonwealth had not yet had a competitive solicitation under the IRM regulations and, therefore, did not have a "final award group" with which to set a contract price pursuant to 220 Code Mass. Regs. § 10.07 (1) (1990).

[5]"The Department's IRM regulations state that a 'company shall offer a purchase price . . . equivalent in value, on a present-worth basis, to the weighted average stream of contractually-set prices paid to all of the project developers from the most recent final award group.' . . . Since Commonwealth has had no 'final award group' in IRM, PREA asserts that the RFP 2 award group price should apply; because it was the Company's most recent award group and IRM evolved from the QF solicitation process.

"While PREA's argument has some merit, Commonwealth presents a more persuasive analysis. As noted . . . above, the IRM regulations cancel and replace the long-term contracting provision of the QF regulations. In addition, the IRM regulations do not state that the most recent QF award group should apply until the Company's first IRM final award group is identified. Unlike the IRM regulations, the QF regulations do not refer to a 'final award group.' Furthermore, it would be inappropriate to apply the

1. PREA correctly points out that, under PURPA, it is entitled to full avoided costs as the price Commonwealth will pay for the power furnished it under the PREA contract. The department, however, has the task of determining what the avoided costs are. PREA maintains that, under department regulations, the avoided costs were those determined in the RFP 2 bidding conducted under the QF regulations. We disagree.

The parties do not dispute that the department's IRM regulations govern PREA's sale of electricity to Commonwealth. Nowhere do those regulations provide that the RFP 2 bidding process determines avoided costs in the absence of a "final award group." Indeed, as the department noted in its decision, the promulgation of the new IRM regulations marked a distinct departure from the superseded QF regulations. Nevertheless, in support of its position, PREA emphasizes that its project was already in the development "pipeline" during the transition from the QF regulatory framework to the IRM process in 1991 and 1992. The department's regulations explicitly state, however, that the QF solicitation reg-

---

prices developed from the QF regulations without also applying the one MW capacity cap established in the QF regulations.

"Therefore, it is appropriate to examine the purposes of IRM and PURPA to determine whether PREA is entitled to the RFP 2 prices. IRM is explicitly intended to establish a process that identifies and acquires least-cost energy resources available to a company. . . . Unlike the QF solicitation process, IRM solicitations include proposals for utility generation and [demand side management] programs and thus should yield more competitive prices than bids from QFs alone. Commonwealth also emphasizes that PURPA does not require a utility to sign a contract in excess of its avoided cost. . . .

"There is no dispute that Commonwealth has had no final IRM award group or that the Company has no current need for capacity. Therefore, the Department finds that PREA is not entitled to the RFP 2 prices which include capacity payments. Consequently, based on the foregoing undisputed facts and as a matter of law, the Department finds that PREA is entitled only to Commonwealth's short-run energy purchase rate. Furthermore, the Department determines that the appropriate price for the PREA contract is the Company QF rate available at the time PREA first approached the Company, i.e., the rate for the first quarter of 1992, which was established in D.P.U. 91-3D." (Footnotes and citations omitted.)

ulations were to have no effect after the implementation date of the IRM regulations, which for Commonwealth was November 15, 1991. PREA did not initiate discussions with Commonwealth regarding the proposed project until January, 1992, and did not tender a formal offer to enter into a contract until April, 1992. The department thus acted well within its authority in concluding that the QF regulations did not apply and, specifically, that the RFP 2 award prices were not relevant. We will not substitute our or PREA's judgment for that of the department. *Attorney Gen.* v. *Department of Pub. Utils.*, 390 Mass. 208, 228 (1983).

Similarly, the department was also warranted in concluding that its decision in *Altresco Lynn, Inc.*, D.P.U. 91-142, did not require it to award PREA the RFP 2 prices. In *Altresco Lynn, Inc.*, Commonwealth asserted that it was relieved from its obligation to enter into a contract with the RFP 2 bid winners, referring to decreased projections for additional capacity and, therefore, decreased avoided costs. The department disagreed, determining that the interests of ratepayers would be best served by requiring Commonwealth to execute the contracts. PREA argues that it is entitled to the identical RFP 2 prices upheld by the department in the *Altresco Lynn, Inc.*, proceeding because the contracts at issue in that case were executed at the same time that PREA sought to enter into a contract with Commonwealth. The *Altresco Lynn, Inc.*, proceeding however, did not involve an interpretation of "final award group" in § 10.07 (1) of the IRM regulations. Rather, it involved the different issue whether changed circumstances justified granting Commonwealth a waiver from its obligation under the QF regulations to enter into a contract to purchase power at a price determined by the bid solicitation process. There was never any question that, if the department concluded that Commonwealth was obligated to purchase power from the bid winners, the RFP 2 award prices continued to be appropriate under the QF regulations. We are not persuaded that this decision somehow compelled the department to assign a simi-

lar contract price under the small generator provisions of the IRM regulations.

2. The case thus comes down to whether the price set by the department was warranted. Arguing that the price conflicts with PURPA and cannot stand, PREA contends that, at a minimum, it is entitled to a purchase price equal to the avoided costs established by Commonwealth in its submissions to the department.[6] The department counters that a conflict with Federal law was not raised before the department and has been waived. The department maintains that, because PREA never argued what the appropriate contract price should be if the department decided that RFP 2 did not apply, PREA cannot now claim that it is entitled under PURPA to receive the avoided cost projections made by Commonwealth in 1992.

We do not accept the department's waiver argument. PURPA is intrinsic to any analysis of the adequacy of the contract price. The statute and its implementing regulations clearly mandate that the rate to be paid by utilities for electric energy be determined by the avoided cost to the utility of generating that energy or purchasing it elsewhere. See *Southern Cal. Edison Co.*, 70 F.E.R.C. par. 61,215, at 61,677 (1995). To be sure, the States are afforded flexibility in calculating avoided costs. However, by no means can the department wholly ignore the avoided cost requirement and arbitrarily assign a purchase price. See *Independent Energy Producers Ass'n* v. *California Pub. Utils. Comm'n*, 36 F.3d 848, 854-855 (9th Cir. 1994).

As stated above, avoided costs include both energy costs and capacity costs. It is unclear when the PREA facility will

---

[6]In October, 1992, Commonwealth, as requested by the department, submitted statistical documentation for its claim that the payment of a power purchase price to PREA equal to the average price paid to the most recent RFP bid winners would exceed Commonwealth's avoided costs by $1.8 million over the life of the contract. The evidence, which was undisputed, established that Commonwealth's avoided costs for the twenty-year term of the contract ranged from 5.6 cents a kilowatt hour in 1997 to twenty-nine cents a kilowatt hour in 2016.

commence operation but the long-run standard contract B with Commonwealth would encompass a twenty-year period. The department's own findings indicate that Commonwealth would require new generating capacity at some point during the contract with PREA.[7] Despite these findings, however, the department, noting that Commonwealth had no current need for capacity, awarded PREA a power purchase price which does not include any capacity payments for the entire twenty-year term of the contract. The department's only explanation for selecting a purchase price which is apparently inconsistent with its own findings, as well as the requirements of PURPA, was that it represented the short-run energy purchase rate established when PREA first requested a contract with Commonwealth in early 1992. Beyond that, the department has not satisfactorily explained why this rate continued to be the appropriate contract price in light of the fact that Commonwealth will likely require additional capacity for a substantial part of the contract. The department may disagree with PREA concerning the proper measure of Commonwealth's avoided costs. That is its prerogative. The department is obligated, however, to provide a reasoned decision on why a contract price that does not include any capacity payments for most of its term, at a rate that would appear to be well below Commonwealth's full avoided costs, is permissible under PURPA and its own regulations. See G. L. c. 30A, § 11 (8) (1992 ed.) (agency decision must have "statement of reasons"). It is not an adequate response that PREA failed to offer evidence of an alternative contract price.

We accordingly vacate the decision of the department in D.P.U. 92-122, and remand the case for further proceedings in light of this opinion.[8] On remand, the department may, if

---

[7]In its decision in *Cambridge Elec. Light Co. & Commonwealth Elec. Co.*, D.P.U. 91-234 (1993), the department confirmed that Commonwealth would need additional capacity beginning in 2001.

[8]It would appear to be implicit in the department's decision requiring Commonwealth to purchase energy from PREA that PREA is a qualifying facility under PURPA. See 16 U.S.C. § 796 (18) (B). The briefs of the

necessary or appropriate, receive evidence concerning Commonwealth's avoided costs.

*So ordered.*

Attorney General, for the department, and of Commonwealth, suggest that PREA has failed to produce evidence that it is a qualifying facility. On remand, if the department deems it appropriate, production of such evidence may be required.