## Turners Falls Limited Partnership *vs.* Board of Assessors of Montague.

No. 99-P-2020.

Suffolk. January 10, 2002. - May 14, 2002.

Present: Brown, Kass, & Kantrowitz, JJ.

*Taxation,* Appellate Tax Board: findings; Value; Real estate tax: value. *Evidence,* Judicial admission.

Where the Appellate Tax Board rejected the opinions of experts from both the taxpayer and the assessors regarding the value of the taxpayer's real property, the taxpayer did not carry its burden of proving that the assessors had overvalued its property. [735-736]

In a proceeding before the Appellate Tax Board, the opinion of an expert witness called by the assessors did not constitute a vicarious or judicial admission by the assessors of the correctness of that opinion in assessing the value of the taxpayer's real property. [736-738]

The Appellate Tax Board properly concluded that a purchased power contract had to be considered in assessing the value of the taxpayer's real property, an electric power plant. [738-741]

Where the Appellate Tax Board (board) ruled that the taxpayer had failed to meet its burden of persuasion that its real property was overvalued by the assessors, yet abated the assessments and therefore must have become convinced that the property was overvalued, this court remanded the case to the board for further proceedings to articulate a rational reason for abatement. [741-742]

Appeal from a decision of the Appellate Tax Board.

*Jay E. Gruber (Kevin Batt* with him) for the taxpayer.

*Ellen M. Hutchinson* for Board of Assessors of Montague.

*Philip Burling & Kevin Conroy,* for PG&E Generating, amicus curiae, submitted a brief.

Kass, J. In their presentation to the Appellate Tax Board (board), the parties debated whether the income stream from a government-sponsored contract should be a factor in determining the fair market value of the taxpayer's real property, an electric power plant. Although the board's decision unmistak-

ably reflects that it regarded the government-related income stream as a significant valuation factor, the board rested its decision wholly on the ground that the opinion of value of an expert witness called by the assessors constituted a vicarious admission by the assessors of the correctness of that opinion. The expert's opinion reduced the assessed value of the real estate in question by $5,427,100 for the tax year 1995, and by $5,298,100 for the tax year 1996. Both the assessors and the taxpayer have appealed from the decision of the board. We decide that the board's theory of vicarious admission was error as matter of law, and we remand the case to the board for further consideration.

1. *Facts.* The real property in question is a cogeneration plant designed to manufacture steam (for a paper company) and electricity. That plant consists of a four-story building of 9,000 square feet per floor, located on a 3.193 acre site in the Turners Falls section of the town of Montague. There is a small attached one-story office building. Within the plant, there are boilers, turbines, condensers, interconnection controls, coal handling equipment, a desulfurization system, transformers, and other equipment. The facility was capable of producing 19.9 megawatts of electricity when in full operation. There is no dispute that the building, inclusive of its equipment, is correctly assessable as real property. See, in that regard, *Boston Edison Co.* v. *Assessors of Boston*, 402 Mass. 1, 3 (1988).

On the assessment dates that are material, January 1, 1994, and January 1, 1995, the taxpayer was Turners Falls Limited Partnership (TFLP), which had possession of the property as a long-term lessee. The tax years, or billing cycles, in issue on appeal are the years 1995 and 1996.[1]

In order to convey the degree to which the Turner Falls co-

---

[1] The date on which assessors determine the fair cash value of real property is January 1 of each year. G. L. c. 59, § 2A. Real property is assessed to its owner as of January 1. G. L. c. 59, § 11. Taxes are then billed on the basis of a tax year or fiscal year that runs from the following July 1 to June 30. G. L. c. 44, § 56. TFLP filed appeals with the board for fiscal 1997 as well as 1995 and 1996, but the appeal for 1997 was dismissed because the taxpayer's applications for abatement (one as to the town and one as to the Montague fire district) had not been timely filed. That tardiness deprived the board of jurisdiction over the fiscal 1997 appeal. See *Roda Realty Trust* v. *Assessors of Belmont*, 385 Mass. 493, 495 (1982); *Guzman* v. *Assessors of Oxford*, 24

generation plant, from its inception, was intertwined with government programs and regulations, we set out in regrettably tedious detail the legislative, regulatory, and contractual background of the power plant venture. The Turners Falls plant was built in 1988 under the stimulus of the Public Utility Regulatory Policies Act (PURPA), Pub. L. No. 95-617, 92 Stat. 3117 (1978), codified in relevant part in 16 U.S.C. §§ 796, 824a-3 (1982). That legislation was a reaction to a nationwide energy crisis during the 1970's. *Federal Energy Regulatory Commn.* v. *Mississippi*, 456 U.S. 742, 745 (1982). PURPA added to the Federal Power Act, 16 U.S.C. §§ 791a et seq., incentives in the form of guarantees and risk protection for the construction of supplementary power generating facilities by nonutility generators. Cf. *Massachusetts Inst. of Technology* v. *Department of Pub. Util.*, 425 Mass. 856; 857 n.2 (1997). Regulated public utilities were obligated to buy power from these independent producers. See *Plymouth Rock Energy Assocs.* v. *Department of Pub. Util.*, 420 Mass. 168, 169 (1995). Skipping over details of limited partnership and corporate relationships, TFLP is a nonutility generator. If a nonutility generator's power plant met criteria prescribed under PURPA and Federal and State regulations promulgated under PURPA, it would gain the status of a "qualifying facility."[2] TFLP secured that status for the Turners Falls plant before it began construction.

PURPA's incentive system required a public utility to factor into the electricity price that it agreed to pay to a qualifying facility what it would cost the utility if it pursued the most efficient alternative method of obtaining the electric power that the qualifying facility could sell. That price factor was known in the industry as "avoided cost." See 18 C.F.R. §§ 292.101(b)(6), 292.303(a), 292.304 (1986). Indeck Energy Services of Turners Falls, Inc. (Indeck), an Illinois corporation with a home base in Wheeling, Illinois, is a general partner in the

Mass. App. Ct. 118, 120 (1987). As to the rationale for this strict rule, see *Tilcon Mass., Inc.* v. *Commissioner of Rev.*, 30 Mass. App. Ct. 264, 266-267 (1991).

[2]The relevant Federal implementing regulations are at 18 C.F.R. Part 292, and the State implementing regulations are at 220 Code Mass. Regs. § 8.00 (1986). The Massachusetts regulations were amended in 2000, but the amendments have no bearing on the assessments made in this case.

taxpayer, TFLP. On November 4, 1986, prior to construction of the TFLP plant, Indeck entered into an agreement (the Purchased Power Contract) with UNITIL Power Corp. (UNITIL), a New Hampshire public utility based in Bedford, New Hampshire. UNITIL agreed to buy Indeck's electric power output from the Turners Falls qualifying facility for twenty years. Apparently by an assignment, TFLP succeeded to Indeck's rights under the agreement with UNITIL.

From calendar year 1991 through 1995, TFLP's annual sales of electricity under the contract with UNITIL averaged about $9,000,000. By 1994, however, the price of oil had begun to tank, producing, by derivation, a sharp decline in the market price of electric power. Notwithstanding that decline, UNITIL was obliged to pay TFLP in accordance with the governmentally directed contract provision that tied the wholesale price to the 1986 avoided cost, i.e., the approximately $9,000,000 per year. UNITIL was bound to that obligation to the year 2009. Both as a business proposition and in terms of public policy, UNITIL's position was awkward because the difference between the contract cost and market cost of energy was ultimately being borne by consumers. Consequently, the Massachusetts Department of Public Utilities encouraged public utilities to buy out contracts such as that between TFLP and UNITIL.

By a Termination Agreement dated August 15, 1996, TFLP and UNITIL agreed to end the Purchased Power Contract; TFLP would mothball the Turners Falls cogeneration plant.[3] In return, UNITIL would make monthly payments to TFLP at the rate of $6,600,000 per year through August, 2009.

2. *Board's view of the evidence.* Five experts, three for the taxpayer and two for the assessors, paraded opinions of value before the board. In its findings, the board in varying degrees found all the expert opinions fatally flawed. It serves no useful purpose to rehearse the details of those opinions and the board's autopsies of them. The parties offered no other evidence concerning value. The consequence of the board's rejections of the expert opinions, therefore, was that the taxpayer had not

---

[3]Apparently the market for steam had also evaporated.

persuaded the board that the property had been overvalued and, therefore, in the formulation employed in State tax cases, had not carried its burden of proving that the assessors had overvalued the property. See *Schlaiker* v. *Assessors of Great Barrington*, 365 Mass. 243, 245 (1974); *Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679, 691 (1982); *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591, 598-600 (1984); *Hampton Assocs.* v. *Assessors of Northampton*, 52 Mass. App. Ct. 110, 118 (2001). "[T]he taxpayer loses when the taxpayer and the assessors present the board with equally footless cases." *Id.* at 119.

As may any trier of fact, the board could accept or reject and pick and choose from evidence the parties present to it. *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 473 (1981). *Hampton Assocs.* v. *Assessors of Northampton, supra* at 115. In the process of weighing the evidence, the board does not have carte blanche; the board must articulate an objectively adequate rationale for rejection of the evidence, particularly expert evidence, put before it. *New Boston Garden Corp.* v. *Assessors of Boston, supra. Hampton Assocs.* v. *Assessors of Northampton, supra* at 115.

3. *Expert's opinion as admission of party that called him.* Along with the opinions offered by other experts, the board shredded that of the assessors' second expert, Neal D. Suess. His appraisal and opinion rested largely on a depreciated replacement cost analysis of the property, and he valued the property at $20,744,000 for fiscal 1995 and $20,873,000 for fiscal 1996. Although well above the opinions of value that the taxpayer had offered, the highest of which, inferentially, was $2,000,000, the Suess opinion was some twenty percent lower than the valuations of the assessors for the years in issue, $26,171,100. As Suess was an expert proffered by the assessors, the board took his opinion as a vicarious admission of the assessors and ordered an abatement of taxes in accordance with the lower Suess valuations.

As used in the Massachusetts cases, a vicarious admission describes an exception to the hearsay rule; namely, a witness may testify to the out-of-court statement of an agent of a party. For example, in *Ruszcyk* v. *Secretary of Pub. Safety*, 401 Mass.

418, 420-424 (1988), the court held that an extrajudicial statement damaging to the codefendant (the Commonwealth), made by the commandant of the State Police Academy, could be received in evidence on the theory that the commandant was an agent of the Commonwealth. The evidence could be admitted only after the trial judge had ruled that the probative value of the evidence exceeded its prejudicial quality. Similarly, an outof-court admission of liability by a party may be received in court through an intermediary witness who heard the statement. *Zandan* v. *Radner*, 242 Mass. 503, 504-505 (1922). See Proposed Mass.R.Evid. 403 and 801(d)(2)(D), which are discussed in the *Ruszcyk* case. See also Liacos, Massachusetts Evidence § 8.8.6 (7th ed. 1999).

So far as the in-court testimony of Suess is concerned, therefore, it was not a vicarious admission as the term is understood, but the point raised by the board's treatment of the Suess opinion as an admission should not turn on nomenclature. See 4 Wigmore, Evidence §§ 1058-1059 (Chadbourn rev. ed. 1972), commenting on the confusion between "quasi admissions" and judicial admissions. The principle that the board is likely to have had in mind is that of the judicial admission, which involves a statement by a party or a party's agent (for example, a lawyer) about a fact that becomes binding on the party as to that fact. An example of a judicial admission is a stipulation by a party's lawyer. Young, Pollets, & Poreda, Evidence § 801.9 (2d ed. 1998). See Liacos, Massachusetts Evidence § 2.2 (7th ed. 1999). "[G]eneral authority to conduct the trial implies the authority to make such admissions." 9 Wigmore, Evidence § 2594 (Chadbourn rev. ed. 1981). Even then, the party-admission principle is not rigorous. The judge generally may consider whether the admission was the consequence of inadvertence, or permit the introduction of corrective evidence by the party. See McCormick, Evidence § 258 (5th ed. 1999).

The question comes down to whether the testimony of an expert witness binds the party that called that expert. To begin with, the proposition that opinion evidence binds the party that presents it contradicts the principle that a finder of fact is not bound by expert opinion evidence, see *Fechtor* v. *Fechtor*, 26

Mass. App. Ct. 859, 863 (1989), even when that opinion evidence is uncontradicted. See *Wyatt, petitioner*, 428 Mass. 347, 360 (1998). If the trier of fact may freely reject all opinion evidence, it hardly matters who offered it. See generally Liacos, Massachusetts Evidence § 2.11 (7th ed. 1999), setting forth the limited circumstances in which a party is bound by her or his testimony.

One might posit that, if the statements of a lawyer in general bind the party the lawyer represents, then the same principle should apply to the expert that the lawyer has engaged and presumably vetted before the expert began to testify. That would, however, mischaracterize the role of the expert. Such an expert is not a party and is not an agent for the party that employed the expert. In theory, the expert is not under the control of the party that presents him and, in theory, the expert testifies impartially to assist the trier of fact about matters not in common knowledge. *Kirk* v. *Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995), cert. denied, 516 U.S. 1145 (1996). In *Taylor* v. *Kohli*, 162 Ill. 2d 91, 94-96 (1994), the court held that it was improper to use as an admission of the plaintiff a deposition of a physician whom the plaintiff had consulted but did not call. The basis for the decision was that the doctor was not an agent of the plaintiff. The United States Tax Court in *Estate of Halas*, 94 T.C. 570, 578-579 (1990), considering the status of an appraiser of the value of shares (of the Chicago Bears Football Club, Inc.) in the Halas Family Holding Company, decided that the appraiser had a public duty corresponding to that of an independent auditor. See *United States* v. *Arthur Young & Co.*, 465 U.S. 805, 817-818 (1984). Cf. *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 272 (1990). Contrast *Fox* v. *Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1355 (5th Cir. 1983).

Both on fundamental principles as to the nonbinding status of opinion evidence and the nonparty status of expert witnesses, the assessors of Montague were not bound by the testimony of Suess.

4. *Bearing of purchased power agreement on fair cash value.* Any potential buyer, acting in a free and open market and

under no compulsion,[4] would have been aware on January 1, 1994, and January 1, 1995, that the owner of the plant was entitled to gross income of about $9,000,000 per year under the purchased power contract described above, roughly through the year 2009.[5] TFLP argues that the contract is an asset it owns apart from the real property on which it is based. In an abstract sense that may be so, but the same could be said for any lease, and yet, the income stream from market leases is the basis for the capitalization of income method of appraising the value of real estate. See *Hampton Assocs.* v. *Assessors of Northampton,* 52 Mass. App. Ct. at 114 n.8. A rational potential purchaser of the TFLP plant on January 1 of 1994 or 1995 would see the income stream from the purchased power contract as integral to the economic value of the property and would not buy it without an assignment of the contract and assurances that neither party was in default under the contract.

There is Massachusetts decisional law that, for assessment purposes, a lease with a long term yet to run that is below the current rental market on the assessment date may be ignored in determining fair cash value. Put more simply, the assessors are to disregard the economic effect of a disadvantageous lease. See *Donovan* v. *Haverhill,* 247 Mass. 69, 72 (1923); *Pepsi-Cola Bottling Co.* v. *Assessors of Boston,* 397 Mass. 447, 450-452 (1986).[6] The taxpayer urges that its purchased power contract with UNITIL is in the same category, and that the assessors

---

[4]For statements of what constitutes fair cash value, see *Boston Gas Co.* v. *Assessors of Boston,* 334 Mass. 549, 566 (1956), and *Boston Edison Co.* v. *Assessors of Watertown,* 387 Mass. 298, 301 (1982).

[5]Section 2 of the purchased power contract provides that the agreement shall be in effect twenty years from the "Commerical In-Service Date," i.e., when the plant was able to go on line. That occurred during 1989.

[6]Unless it is meant to apply only to circumstances in which a disadvantageous lease has been contrived, as between related parties, the principle established by the cases is somewhat anomalous. Assuming an ordinary case, in which a twenty-year lease is entered into at arm's length on the basis of the existing rental market, the rent reserved in the lease might well be below market by the twelfth year of the lease. Yet an arm's length buyer of the property, in determining what price to offer to buy (the fair cash value), would have to consider the income stream from the leases in force, not on the basis of what income the property might produce if the rents in all existing leases could be brought up to the current market.

must disregard the income from the contract for assessment purposes.

To that general rule there is an exception for governmentally induced limitations on rents. See *Community Dev. Co. of Gardner* v. *Assessors of Gardner*, 377 Mass. 351, 355-356 (1979). Low interest government loans or mortgage interest subsidies to prime the pump for construction of low and moderate income housing illustrate the point. In exchange for the government assistance, developers agree to governmental control of apartment rents. The *Gardner* case is an example. There, the owner was receiving mortgage interest subsidy from the United States Department of Housing and Urban Development (HUD) and the rents it could charge were limited by HUD regulation so that they were below market. Achieving below market rents was the whole point of the government assistance program. The court held that the assessors were bound to recognize the income limitation. Closer to the case at hand, in *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 304 (1982), the court said, "If property is known to be subject to . . . a governmentally-imposed restriction affecting . . . its earning power, that fact should be considered in any determination of its fair cash value."

In the case of TFLP's generating plant, the government intervention produced not only an income ceiling, as in the *Gardner* and *Watertown* examples, but a floor. See *Plymouth Rock Energy Assocs.* v. *Department of Pub. Util.*, 420 Mass. 168, 170 (1995). See also *American Paper Inst., Inc.* v. *American Elec. Power Serv. Corp.*, 461 U.S. 402, 404-406 (1983). Under PURPA, see 16 U.S.C. § 824a-3 (1982), the Federal Energy Regulatory Commission was instructed to prescribe rules to encourage cogeneration and small power production and to require public utilities to buy from qualifying facilities. As remarked in note 2, *supra*, the regulations Congress mandated appear in 18 C.F.R. Part 292. Notably, § 292.304 laid down rules for the rates at which public utilities may purchase power from qualifying facilities and established criteria for determining avoided costs. 18 C.F.R. § 292.304 (1986). There was State regulation as well. Title 220 of the Code of Massachusetts Regulations spelled out the rules for determining rates, terms,

and conditions governing the sale of electricity by qualifying small power producers and qualifying cogenerators to utilities. 220 Code Mass. Regs. § 8.01 (1986). The regulatory scheme prescribed allowable terms and conditions for sale of power by qualifying facilities to utilities and required the submission of purchase contracts.[7]

While there was much that the parties to the purchased power contract of November 4, 1986, were free to negotiate, it is apparent that the Federal and State agencies were metaphorically at the negotiating table when TFLP and UNITIL worked out that contract. Those parties could not make agreements free from governmental prescription and review that would assure payments to TFLP sufficient to cover the financing costs of building the plant, as well as providing a reasonable rate of return on investment. There was substantial evidence in the form of statutes, regulations, and testimony on which the board could base its conclusion that the purchased power contract had to be considered in the valuation process.

5. *Enigmatic quality of the board's decision.* The board ruled that the taxpayer had failed to meet its burden of persuasion that the Turners Falls plant was overvalued by the assessors. Yet the board abated the assessments by over $5,000,000 for each of the years in question. So, at a certain level, the board must have become convinced that the property was overvalued.

For the reasons explained above, the board was mistaken, as matter of law, in taking the Suess opinion of value as a binding admission of the assessors. The board may take some direction from cases such as *Boston Edison Co.* v. *Assessors of Watertown*, 387 Mass. 298, 301 (1982), that "resort to the property's depreciated reproduction cost is particularly appropriate," as a tool, although not an exclusive one, of establishing the fair cash value of electric generating equipment. See *Boston Edison Co.* v. *Assessors of Boston*, 402 Mass. 1, 12-13 (1988). Also, appropriately, the process of valuation must consider that market

[7]Title 220 Code Mass. Regs. § 8.02 (1986) identified eight "affected utilities," all Massachusetts public utilities. UNITIL is a New Hampshire utility but it appears to be understood by the parties (an expert witness for TFLP, for example, so testified) that UNITIL was not free from oversight by Massachusetts regulators in connection with the purchased power contract.

conditions have so changed that the plant, whatever its depreci-ated reproduction cost, appeared to be a white elephant for the indeterminate future. Against that circumstance, the board could consider the guaranteed income under the purchased power contract.

Having shown that it thought the property overvalued, the board must articulate a rational reason for abatement. The board's decision is vacated, and we remand the case to the board for further proceedings consistent with this opinion. We do not intimate that the board is tied to determinations of over-valuation previously made. The board may decide that the fair cash value of the property on the assessment dates was less or more than the amounts its decision established. The board may, in its discretion, reconsider the case on the basis of the existing record or elect to receive additional evidence.

*So ordered.*