MARK POLLARD & another[1] *vs*. CONSERVATION COMMISSION
OF NORFOLK.

No. 06-P-1134.

Norfolk. November 5, 2007. - December 17, 2008.

Present: PERRETTA, GELINAS, & KANTROWITZ, JJ.[2]

*Zoning*, Wetlands. *Administrative Law*, Decision, Judicial review.

In a civil action in Superior Court challenging the defendant town conserva-
tion commission's (commission's) denial of the plaintiffs' application to
build, on an undeveloped lot, a single-family house with a private well and
subsurface septic system on the ground that the plaintiffs had failed to
demonstrate that the work proposed to be done within wetland buffer
zones would not harm interests protected by the town's wetlands protec-
tion bylaw, the commission's findings did not permit this court to engage
in a meaningful review of the issue whether the commission had determined
the probative value of the plaintiffs' evidence in accordance with established
legal principles; therefore, this court affirmed the decision of the judge
reversing the denial. [348-351]

CIVIL ACTION commenced in the Superior Court Department on
July 2, 2004.

The case was heard by *Barbara A. Dortch-Okara*, J., on a
motion for judgment on the pleadings.

*George A. Hall, Jr.*, for the defendant.

*Matthew Watsky* for the plaintiffs.

PERRETTA, J. Acting pursuant to the town of Norfolk's (town)
wetlands protection bylaw and associated regulations, the town's
conservation commission (commission) denied the plaintiffs' ap-
plication to build a three-bedroom, single-family house with a
private well and subsurface septic system on an undeveloped lot
of land. The reason for the denial was that the commission had

---

[1]Joanne Pollard.

[2]Judge Gelinas participated in the deliberation on this case prior to his
retirement.

concluded, on essentially uncontested evidence, that the plaintiffs had failed to demonstrate that the work proposed to be done within the zero- to fifty-foot (fifty-foot) and fifty- to 100-foot (100-foot) wetland buffer zones would not harm those interests protected under the bylaw. The plaintiffs then sought certiorari review of the commission's decision pursuant to G. L. c. 249, § 4. Acting on a motion for judgment on the pleadings, see Mass.R.Civ.P. 12(c), 365 Mass. 756 (1974), the judge in the Superior Court reversed the commission's decision on the basis that it was unsupported by substantial evidence. We affirm the judgment.

1. *The facts.* On December 11, 2002, the plaintiffs filed a notice of intent to construct a single-family house on the lot in question. Subject to special conditions, the commission approved the project under G. L. c. 131, § 40, the so-called State Wetlands Protection Act (act), but denied the project under the town's wetland protection bylaw. The plaintiffs appealed so much of the commission's decision as was pertinent to the act to the Department of Environmental Protection (DEP). The DEP issued a superseding order of conditions and found that "the project as proposed and conditioned . . . adequately protect[ed] the interests of the [act]." The plaintiffs thereafter withdrew their original notice of intent, modified their proposal to respond to the concerns articulated by the commission, and filed a second notice of intent under the town's bylaw. It is this second notice of intent which is the subject of the appeal now before us. The following facts appear in the record.

a. *The project.* In this action, the plaintiffs seek to build a single-family residence having three bedrooms, a private well, and a subsurface septic system on a 70,878 square foot undeveloped lot (locus) located within a subdivision of the town. The locus is encumbered by a man-made drainage channel (channel) and a stormwater detention basin (basin) that function to manage stormwater runoff from nearby roadways and neighboring properties.[3]

A natural red maple wooded swamp receives treated storm-

---

[3]In the judge's memorandum of decision and order on the plaintiffs' motion for judgment on the pleadings, she stated that the basin is adjacent to the locus.

water discharge from the basin. Because the basin was excavated into the groundwater table, it also receives groundwater input. The basin and the channel are subject to regulation and protection under the town's wetlands protection bylaw and the commission's wetlands protection regulations (regulations) pertaining to so-called "resource areas."[4] The regulations further define as a protected resource area the "area of land extending 100 feet horizontally outward from the boundary of any [specified resource] area." The 100-foot buffer zone area is presently wooded, with the northern portion of the site comprised of mature deciduous trees. The area within the fifty-foot buffer zone to both the basin and channel is characterized by a dense vegetative cover of saplings and shrubs.[5] Due to the presence of the basin and channel, approximately ninety-seven per cent of the locus is subject to wetlands regulation, including 59,720 square feet of land within the fifty-foot buffer zone and 9,332 square feet of land within the 100-foot buffer zone. The plaintiffs propose to install a well within the fifty-foot buffer zone.

b. *Wetland protection provisions.* Section 3(1)(a) of the regulations establishes a presumption that provides, in pertinent part:

"[A]n undisturbed forest or naturally vegetated buffer of at least [fifty] feet . . . between the edge of [a] [r]esource [a]rea . . . and the area the applicant proposes to disturb . . . is necessary to protect the interests of the [b]ylaw."

The regulations go on to provide, in section 3(1)(b), that persons seeking to disturb land within the fifty-foot buffer zone "shall have the burden of showing that [such] work . . . will not harm the interests protected by the [b]ylaw." Section 4(3) of the regulations reads, again in pertinent part, that "[l]ands within 100 feet of . . . [specified] resource areas . . . are presumed [to be] important to the protection of [wetlands] resources." It is on the basis of that regulation that the commis-

---

[4]Although not entirely clear from the record, it appears that the channel meets the definition of an "intermittent stream" under the regulations and that wetland vegetation developed inside the basin following its construction. Consequently, that part or all of the basin is subject to protection as a freshwater wetland.

[5]There is evidence in the record to indicate that the dense sapling growth is indicative of past clearance to create the basin and channel.

sion may require an applicant to maintain a strip of continuous, undisturbed vegetative cover within that area "unless the [a]pplicant convinces the [c]ommission that the area or part of it may be disturbed without harm to the values protected by the [b]ylaw."

Section 4(5) of the regulations has some relevance to our analysis. That regulation reads, in relevant part:

"To prevent loss of [r]esource [a]reas (including the 100 [f]oot [b]uffer [z]one . . . ), the . . . [c]ommission shall require [a]pplicants to avoid alteration of [r]esource [a]reas wherever feasible; to minimize alteration of [r]esource [a]reas; and, where alteration is unavoidable, to provide full mitigation."

More plainly put, and as stated in section 4(1) and (2) of the regulations, persons seeking relief pursuant to the regulations bear the burden of production and proof, by a preponderance of the credible evidence, that their proposed activities will not harm interests protected by the wetlands bylaw.

c. *The plaintiffs' proposal.* To mitigate any adverse impacts of alterations to the buffer zones, the plaintiffs proposed the use of sedimentation and erosion controls during construction, the restoration of areas temporarily affected by construction, and the establishment of a conservation restriction over all the wetlands located on the locus and portions of the buffer zones, including 19,605 square feet of land within the fifty-foot buffer zone and 568 square feet of land within the 100-foot buffer zone.[6] The plaintiffs also agreed to maintain the fifty-foot buffer zone in its natural state rather than converting any portion of it to lawn.

To address the question of potential impacts of the proposed work on wetland interests, the plaintiffs submitted to the commission, along with other materials, a report prepared by an environmental consulting and engineering firm hereinafter referred to as the "consultant." The consultant opined in that report that the work proposed in the plaintiffs' application would have "no im-

_____

[6]The actual terms of this easement or restriction are not in the record. However, the plaintiffs represented in their motion for judgment on the pleadings that "[t]he [r]estriction would prevent the [plaintiffs] and any subsequent owners from filing a [notice of intent], establishing that the project will not in the future affect wetlands values, barring any future effort to seek a permit to build a shed or pool or plant a lawn."

pact on the ability of the [b]uffer [z]one . . . to protect the interests identified in the [commission's] [r]egulations" and that the plaintiffs' proposed project "fully complie[d] with the requirements of the [town's] [b]ylaw."

The consultant's report contained a detailed discussion of the wetland functions served by the resource areas on the site and, with respect to the fifty-foot buffer zone, an individualized assessment of the impact of the proposed work on six specific wetlands values.[7] Its analysis addressed issues of erosion control, protection of groundwater, protection of private and public water supplies, storm damage prevention, protection of wildlife habitat, and pollution prevention.

As also noted and reported by the consultant, the work proposed within the fifty-foot buffer zone, that is, work involving the installation of a well and waterline, would result in only a temporary disturbance; the affected land would be revegetated and restored to its preconstruction conditions; and any future maintenance of the plaintiffs' proposed well could be conducted by hand without intrusion into the vegetative cover or soil surface. With respect to the question of erosion control, the consultant determined that the basin and not the buffer zone served to "capture road sand and keep it from the wetlands," that the plaintiffs' proposal would not impair the ability of the basin to serve and satisfy that function, and that the channel, basin, and downgradient wetlands would be further protected from sediment inflow by the plaintiffs' proposed erosion and sedimentation control measures.

According to the consultant, the channel and basin functioned to manage the flow of stormwater runoff and to receive and treat such waters so as to prevent "pollutants from entering the adjacent wetlands." The consultant determined that the proposed work within the fifty-foot buffer zone would not have an adverse impact on the ability of the channel and basin to perform these functions. Nor would the work proposed to be done within the fifty-foot buffer zone introduce a source of pollutants into that area.

With respect to the protection of groundwater and public and private water supplies, the consultant stated that the siting of

---

[7]As considered *infra*, the consultant's report did not set out a similar analysis for the work proposed within the 100-foot buffer zone.

the well "[would] not result in any impervious surface" or "decrease the amount of groundwater infiltration within the . . . area . . . where work [was] proposed." Further, the "minimal" use of water associated with one single-family home was "not anticipated to [a]ffect groundwater volume or elevations."

In respect to the protection of wildlife habitat, the consultant reported that site investigations revealed no evidence of animal trails within the fifty-foot buffer zone "no[r] evidence of wildlife use . . . in the vicinity of the drainage [channel]." Also, according to the State natural heritage and endangered species program, no rare wildlife species were known to inhabit the property. Moreover, because the work within the fifty-foot buffer zone would be temporary, and the area restored following construction, the proposed project would result in no long-term impact to any wildlife habitat.

Based upon the foregoing reasons, the consultant concluded that "no impacts are anticipated to the ability of the . . . [channel], . . . basin, and associated [fifty-foot] [b]uffer [z]one to protect the interests identified in the bylaw" and that the work proposed within that buffer zone would not harm the interests protected by the bylaw. The consultant further stated that the proposed work would not result in any changes to the existing hydrologic or vegetative conditions within the basin or channel because no work was proposed to be performed within those areas.

The consultant's testimony concerning the 100-foot buffer zone lacked the detailed analysis pertaining to the fifty-foot buffer zone. See note 7, *supra*. As to this larger buffer zone, the consultant opined that the plaintiffs, in accordance with the performance standards set out in section 3(2)(b)(2) of the regulations, had made "reasonable effort[s]" to minimize the impact of work within the larger buffer zone. Those efforts primarily consisted of minimizing the amount of work within that buffer zone and siting the house and its associated features outside of, or as far away as possible from, protected resource areas while also complying with the applicable requirements of the bylaw and 310 Code Mass. Regs. §§ 15.00 et seq. (1995), more commonly known as Title V. The consultant also stated that the

plaintiffs had proposed "substantial" mitigation measures to ameliorate or compensate for any adverse impact to the protected wetlands.

No other party presented evidence to the commission.

2. *The commission's decision.* The commission concluded that the plaintiffs had failed to make the showings required under the regulations with respect to the work proposed in both the fifty-foot and 100-foot buffer zones. In reaching this conclusion, the commission found that, in general, the buffer zones were "significant" to the protection of many wetland interests: private and public water supplies; groundwater and groundwater supplies; surface water quality in the town's numerous ponds, rivers, lakes, and streams; flood and erosion control; storm damage and water pollution prevention; and the protection of wildlife and the wildlife habitat.[8]

As to the project under consideration, the commission made the following specific findings. As proposed, the project would result in the "disturbance" of an area of 191 square feet situated within the fifty-foot buffer zone caused by the excavation of the well site and the placement of a waterline. The commission also found that the installation of the well would involve the removal of trees and vegetation. As further found by the commission, construction of a subsurface septic system, dwelling, driveway, and grading would cause a "disturbance" of an area of 9,023 square feet situated within the 100-foot buffer zone.

With respect to the proposed work to be done within the fifty-foot buffer zone, the commission stated simply that the plaintiffs had submitted "no credible evidence" to support a determination that the installation of the well would not harm interests protected by the bylaw. Turning to the 100-foot bylaw, the commission ruled that the plaintiffs had failed to demonstrate that the proposed work "would not have unacceptable significant and cumulative effects upon the wetland values protected under

---

[8]The commission also noted that the fifty-foot buffer zone "provides a number of important functions including the attenuation of pollutants and protection from . . . adverse impacts from [use of] adjacent uplands areas, including the adjacent roadway, which often result in changes to the biological, chemical and physical properties of the wetlands resources." The commission further noted that the "loss of vegetative buffer would also cause adverse impacts to wildlife and wildlife habitat."

the [b]ylaw." In making this ruling, the commission noted that the plaintiffs proposed to alter the entire larger buffer zone while again failing to sustain their burden of showing that the loss of the existing vegetated buffer resource would not adversely impact the protected resource areas it bordered.

More specifically, the commission concluded that the plaintiffs had not met the requirement of section 4(5) of the regulations, that is, they had failed to meet their burden of demonstrating that "the loss of the . . . [100-foot] buffer resource 'ha[d] been mitigated in full.' " The commission set out two reasons for its conclusion as to the 100-foot buffer zone: (1) the areas of this buffer zone that would be subject to the conservation easement, see part 1.c and note 6, *supra*, were limited to a "small" triangle of land on the southeasterly side of the locus and a second area of approximately 309 square feet along the northerly border of the locus at the furthest point away from the "resource areas" bordered by the buffer zone; and (2) the commission did not deem the establishment of a conservation easement on bordering vegetated wetlands or the fifty-foot buffer zone, an area "already restricted to no alteration," to be mitigation for the lost buffer resource.

3. *The judge's decision.* As stated at the outset, the judge reversed the commission's decision on the stated basis that it was unsupported by substantial evidence. The judge reasoned that the plaintiffs had presented "substantial" evidence that included scientific studies and the opinion of an expert in support of their contention that their proposed project would have no adverse effect on the fifty-foot buffer zone. On the other hand, the judge found nothing in the record to show that the commission presented any testimony or other evidence that contradicted the plaintiffs' evidence or supported its findings and conclusions.

Based upon her review of the record, the judge concluded that the evidence was "overwhelmingly" contrary to the commission's determination that the plaintiffs had failed to meet the burden imposed upon them by the regulations, that is, that the plaintiffs had failed to meet their burden of showing that their proposed work could go forward without harm to wetlands interests. The judge also concluded that the commission's determination that the plaintiffs' proposed mitigation measures were

inadequate to satisfy the requirements of the regulations was unsupported by substantial evidence.

4. *The applicable standard of review.* Review under G. L. c. 249, § 4, "is available only to correct 'substantial errors of law apparent on the record and which adversely affect material rights.' " *Massachusetts Bay Transp. Authy.* v. *Auditor of the Commonwealth*, 430 Mass. 783, 791 (2000), quoting from *Murray* v. *Second Dist. Ct. of E. Middlesex*, 389 Mass. 508, 511 (1983). See *State Bd. of Retirement* v. *Bulger*, 446 Mass. 169, 173 (2006). Also, "[t]he nature or scope of the review [pursuant to G. L. c. 249, § 4,] accommodates to the kind of administrative decision involved." *Yerardi's Moody St. Restaurant & Lounge, Inc.* v. *Selectmen of Randolph*, 19 Mass. App. Ct. 296, 300 (1985). See *Boston Edison Co.* v. *Boston Redev. Authy.*, 374 Mass. 37, 79 (1977) (Quirico, J., concurring). In reviewing the decision of a local conservation commission, we must consider whether it was legally tenable and supported by substantial evidence on the record as a whole. In respect to the matter before us, the question is whether the judge correctly concluded that the commission's decision was arbitrary and capricious or unsupported by substantial evidence. See *Rodgers* v. *Conservation Commn. of Barnstable*, 67 Mass. App. Ct. 200, 204 (2006).

5. *Discussion.* It is the commission's argument that it was entitled to determine the probative value of the plaintiffs' evidence. Because the commission declined to credit the plaintiffs' evidence, it concluded that the plaintiffs failed to sustain their burden of proof as required by the regulations and that its denial of an order of conditions was valid and must be upheld. The commission asserts that the judge exceeded the applicable scope of her review by independently evaluating the weight of the evidence and substituting her own conclusions concerning its sufficiency for those of the commission.

In support of the judgment in their favor, the plaintiffs advance three arguments: (1) the commission "rejected without explanation all conclusions presented regarding compliance with the bylaw standards and [impermissibly] substituted its own views as if those were evidence"; (2) the true reason that the commission denied their application is that it wanted the town to regain and retain the locus as conservation land; and (3) by its ruling,

the commission has effectively implemented an ad hoc rule that imposes an absolute prohibition on work in the buffer zones.[9]

In taking up the commission's argument, we begin by setting out the established principles pertinent to our analysis. That it is the commission's prerogative to determine the probative value of expert evidence is not subject to debate. See *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 634, 639 (1985); *Assessors of Newton* v. *Iodice*, 29 Mass. App. Ct. 1014, 1016 (1991).

Moreover, the commission was not required to credit the opinion of the plaintiffs' expert even though it was uncontradicted. *Daniels* v. *Board of Registration in Med.*, 418 Mass. 380, 392 (1994). *Turners Falls Ltd. Partnership* v. *Assessors of Montague*, 54 Mass. App. Ct. 732, 737-738 (2002). However, this established principle is not without its limitations. In *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 470-471 (1981), the court relied upon and quoted from Jaffe, Judicial Control of Administrative Action 607 (1965), for the principle that "evidence of a party having the burden of proof may not be disbelieved without an explicit and objectively adequate reason." As applicable to the matter before us, there must be a basis in the record for the rejection of uncontradicted expert opinion evidence or for remaining unpersuaded. See *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. at 639; *Turners Falls Ltd. Partnership* v. *Assessors of Montague*, *supra* at 736; *Narducci* v. *Contributory Retirement Appeal Bd.*, 68 Mass. App. Ct. 127, 137 (2007); *id.* at 142-143 (Mills, J., dissenting). The purpose of the rule is to guard against arbitrary rulings by administrative agencies.[10] *Id.* at 137. Cf. *Fisch* v. *Board of Registration of Med.*, 437 Mass. 128, 138

___

[9]Although the plaintiffs also assert that they were not required to provide mitigation for alterations proposed within the 100-foot buffer zone, their assertion is unsupported by argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

[10]The commission asserts that the reversal of its decision "implies that the only way [its] denial [of the order of conditions] could be supported by substantial evidence [would be] if the [c]ommission hired its own consultant to support its conclusions and rebut the [plaintiffs'] consultant's opinions." We think the commission's concern is unfounded; conflicting expert evidence is but one basis upon which an agency might justifiably decline to credit one expert's opinion. An agency may justifiably reject an expert's opinion on

(2002) (reviewing court may vacate agency's decision as unsupported by substantial evidence if agency's decision provides no means of analyzing its assessment of credibility).

Contrary to the commission's arguments, the issue before us is *not* whether it was entitled to determine the probative value of the plaintiffs' evidence. Rather, the issue is whether the commission determined the probative value of the plaintiffs' evidence in accordance with established legal principles. The commission's findings do not permit us to engage in a meaningful review of this issue. As stated in *Costello* v. *Department of Pub. Util.*, 391 Mass. 527, 535-536 (1984), quoting from *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys.*, 419 U.S. 281, 285-286 (1974):

> "While [a court] can conduct a meaningful review of 'a decision of less than ideal clarity if the agency's path may reasonably be discerned,' we will not 'supply a reasoned basis for the agency's actions that the agency itself has not given.' "

Contrast *Sheriff of Plymouth County* v. *Plymouth County Personnel Bd.*, 440 Mass. 708, 710-712 (2004) (lack of written findings did not require reversal of board's decision where only one disputed issue was presented and board's reasoning could be determined with reasonable certainty from record).

In the case before us, the commission has not chosen to clarify the question on appeal by pointing to anything in the record to explain its rejection of the plaintiffs' evidence or the perceived

---

the basis of facts in the record that make the rejection of the expert evidence reasonable, including facts of a nontechnical nature. See *Woolfall's Case*, 13 Mass. App. Ct. 1070, 1071-1072 (1982); *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. at 640-641; *Narducci* v. *Contributory Retirement Appeal Bd.*, 68 Mass. App. Ct. at 137. Other instances in which an agency may reasonably reject an expert's opinion are where there are flaws in the methodology or assumptions upon which the opinion depends or where the opinion is based upon conjecture or guesswork. See, e.g., *Cataldo* v. *Contributory Retirement Appeal Bd.*, 343 Mass. 312, 314 (1961); *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 468; *Hampton Assocs.* v. *Assessors of Northampton*, 52 Mass. App. Ct. 110, 114-115 (2001). Cf. *Kennedy* v. *U-Haul Co.*, 360 Mass. 71, 73-74 (1971) ("A mere guess or conjecture by an expert witness in the form of a conclusion from basic facts that do not tend toward that conclusion any more than toward a contrary one has no evidential value").

deficiencies in that evidence. Nor has the commission offered any particularized grounds for denying the plaintiffs an order of conditions. Rather, the commission has chosen simply to assert that the plaintiffs' evidence was "not credible" and that they "failed to sustain their burden." These are not credibility determinations that are entitled to deference.[11] The commission's choice has left us unable to determine with any reasonable degree of certainty that its decision was arrived at with fairness and without predisposition.

6. *Conclusion.* It follows from all that we have said that the judgment is affirmed.

*So ordered.*

---

[11]We note that the commission remarked in passing in its brief that the plaintiffs attempted to meet their burden by "arguing, in effect, that the wetland resource areas on the [s]ite were of poor quality." However, this vague and generalized allegation is unsupported by reference to specific examples or explanation. Instead, the commission points only to the fact that the plaintiffs' consultant characterized the plant species colonizing the south side of the detention basis as "invasive" and reported a lack of observed wildlife features. Moreover, the commission's brief mischaracterizes the nature of the evidence presented to it. The consultant's report set out a detailed discussion of the wetland features on the site and, at least in respect to the fifty-foot buffer zone, individualized analyses of the impact of the proposed work upon various wetland values. Even accepting for purposes of argument that portions of the consultant's report might be read as disparaging the quality of the wetlands at issue, such disparagement was not the sole or dominant focus of the consultant's analysis.