NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-489                                      Appeals Court


   WENDY STONE-ASHE, trustee,[1] vs. DEPARTMENT OF ENVIRONMENTAL
                     PROTECTION & another.[2]



                      No. 13-P-489.

        Suffolk.     January 14, 2014. - July 16, 2014.

           Present:  Trainor, Graham, & Agnes, JJ.


Trust, Public trust.  Department of Environmental Protection.
     Administrative Law, Agency's authority, Regulations.
     Regulation.  Real Property, Littoral property, Harbors,
     Wharf, Restrictions.  Harbors.  Evidence, Expert opinion.
     Witness, Expert.




     Civil action commenced in the Superior Court Department on
October 29, 2010.

     The case was heard by Bonnie H. MacLeod, J., on a motion
for judgment on the pleadings.


     Richard A. Nylen, Jr., for the plaintiff.
     Jo Ann Shotwell Kaplan, Assistant Attorney General, for the
defendants.

---

     [1] Of the Stone-Ashe Realty Trust.

     [2] Commissioner of the Department of Environmental
Protection.

GRAHAM, J.  The plaintiff, Wendy Stone-Ashe, trustee of the Stone-Ashe Realty Trust,[3] appeals from a Superior Court judgment that affirmed a final decision of the Commissioner (commissioner) of the Department of Environmental Protection (department), which concluded that a seawall on the plaintiff's property lies seaward of the historic high water mark and, therefore, is under the jurisdiction of the department and subject to public rights pursuant to G. L. c. 91.  Substantially for the reasons stated in the decisions of the commissioner and the Superior Court judge, we affirm.

Background.  1.  Statutory and regulatory framework. "Under the public trust doctrine, the Commonwealth holds tidelands in trust for the use of the public for, traditionally, fishing, fowling, and navigation."  Moot v. Department of Envtl. Protection, 448 Mass. 340, 342 (2007), S.C., 456 Mass. 309 (2010).  See generally Boston Waterfront Dev. Corp. v. Commonwealth, 378 Mass. 629, 631-632 (1979) (detailing history of public trust doctrine).  In enacting G. L. c. 91, the Legislature delegated at least some of its authority to preserve and regulate the Commonwealth's tidelands to the department. Moot v. Department of Envtl. Protection, supra at 347.  General Laws c. 91, § 1, inserted by St. 1983, c. 589, § 21, defines

_____

[3] We use the term "plaintiff" to refer to both the trustee and trust.

"[t]idelands" as "present and former submerged lands and tidal flats lying below the mean high water mark." "Private tidelands" are defined as "tidelands held by a private party subject to an easement of the public for the purposes of navigation and free fishing and fowling and of passing freely over and through the water." Ibid.

The department's jurisdiction extends only to the tidelands seaward of the historic high water mark. "[B]ecause actual high and low water marks can change over time, notably pursuant to licenses to fill flats and submerged lands with soil, the starting point for determining the public's rights in tidelands (filled or unfilled) must be the historic, or 'primitive,' high and low water marks." Arno v. Commonwealth, 457 Mass. 434, 437 (2010). Accordingly, the department has promulgated regulations, as authorized by G. L. c. 91, § 18, defining the historic high water mark and guiding the department's determination of its location. See 310 Code Mass. Regs. §§ 9.00 et seq. (1996). The regulations define the "historic high water mark" as "the high water mark which existed prior to human alteration of the shoreline by filling, dredging, excavating, impounding, or other means. In areas where there is evidence of such alteration by fill, the [d]epartment shall presume the historic high water mark is the farthest landward former shoreline which can be ascertained with reference to topographic

or hydrographic surveys, previous license plans, and other historic maps or charts, which may be supplemented as appropriate by soil logs, photographs, and other documents, written records or information sources of the type on which reasonable persons are accustomed to rely in the conduct of serious business affairs."[4]  310 Code Mass. Regs. § 9.02 (2000). It is uncontested that the harbor at issue has been altered by fill and that the determination of the location of the high water mark under the regulations dictates the department's jurisdiction over the seawall at issue.

2.  Procedural history.  In 2006, the Harbor Access Group (HAG), a group of Rockport residents, filed a request for a determination of applicability as to whether the seawall at issue (seawall-walkway)[5] is under the department's jurisdiction. See 310 Code Mass. Regs. § 9.06 (2000).  The department issued a positive determination.  The plaintiff appealed to the Division of Administrative Law Appeals.  HAG was allowed to intervene as a party.  An administrative magistrate conducted an evidentiary hearing and a battle of experts ensued.

---

[4] Upon a clear showing that a seaward migration of a shoreline occurred as a result of natural accretion and was not caused by the owner or any predecessor in interest, resort to the historic high water mark is not required.  310 Code Mass. Regs. § 9.02 (2000).  There has been no such showing in the case before us.

[5] As the seawall at issue is topped by a walkway, we refer to it as the "seawall-walkway."

The administrative magistrate adopted the opinion of the plaintiff's expert, Erich Gundlach, a coastal biologist, and recommended that the commissioner issue a final decision reversing the initial determination of applicability. On further review, the commissioner issued a final decision in which she declined to adopt the administrative magistrate's recommendation. The commissioner found Gundlach's approach inconsistent with the department's regulations and adopted the position of HAG's expert, professional surveyor Sean Ewald, and the department's witness, Alex Strysky, a department employee experienced in G. L. c. 91 jurisdictional determinations. The commissioner concluded that the seawall-walkway is seaward of the historic high water mark and, therefore, under the department's jurisdiction. On the plaintiff's appeal pursuant to G. L. c. 30A, § 14, a Superior Court judge affirmed the final decision of the commissioner.[6] From the resulting judgment, the plaintiff brought this appeal.

3. <u>Facts</u>. We draw the facts from the decision of the administrative magistrate, supplemented by the commissioner's decision and the administrative record where necessary. The plaintiff owns a single-family residence located at 25 Dock Square in Rockport and situated between Lumber Wharf to the west

---

[6] HAG was not a party to the c. 30A appeal, and it is not a party to the appeal before us.

and Middle Wharf to the east in a portion of "Old Harbor," variously referred to as the "whirlpool" and the "Bason" or "Basin." A third wharf, White Wharf,[7] east of Middle Wharf, comprises the northeasterly arm of the harbor. The seawall-walkway at issue is a ten-foot-wide seawall topped with a cement walkway that runs 108 feet across the plaintiff's property and connects Lumber Wharf and Middle Wharf. Directly landward of the seawall-walkway is another granite wall which one of the plaintiff's experts has referred to as a "retaining wall."

The record reflects that the plaintiff's property derives from property once owned by Ebenezer Pool dating back to 1746. On April 28, 1746, the proprietors of Gloucester granted Pool permission to construct a wharf on the southwest side of the whirlpool opposite his "other wharf," likely White Wharf or a precursor to it. They also granted Pool "all the land or flats there needed for that service."[8] Nearly sixty-five years later, on February 25, 1811, the Legislature established the Sandy Bay Pier Company for the purpose of erecting a stone pier. Before agreeing to transfer to the Sandy Bay Pier Company the property which had been granted to Pool in 1746, Pool's grandson, also

---

[7] The wharfs also are referred to as piers in the administrative record. To avoid confusion, we use only the terms "wharf" and "wharfs."

[8] On March 25, 1743, at a commoner's or proprietor's meeting held in Gloucester, Ebenezer Pool and others had been authorized to build a wharf at the whirlpool.

named Ebenezer Pool, successfully negotiated to retain certain uplands and flats.  In a letter dated January 29, 1811, to the committee appointed for the purpose of examining the request to incorporate the Sandy Bay Pier Company, Pool withdrew his objection, indicating that the incorporators had agreed to his proposal to allow him forty feet of tidal flats adjoining his seawall pursuant to a "plan taken January 26, 1811." Thereafter, in an 1813 deed to the Sandy Bay Pier Company, the grandson conveyed the land granted to his grandfather in 1746, but reserved "that part of the said Premises which I have heretofore enclosed and also forty feet of said flats running towards the Sea from each corner of my Sea Wall as it now stands and being about one hundred and six feet by the Sea Shore."  The plaintiff's property derives from the retained lot.  Other than the reference to an existing "Sea Wall" contained in the 1813 deed and 1811 letter, the record is devoid of further information on the history of the two walls on the plaintiff's property.

    4.  <u>Expert testimony</u>.  a.  <u>HAG's expert</u>.  HAG's case primarily rested on a plan created by the BSC Group, Inc. (BSC), a surveying company, and the testimony of its professional surveyor, Sean Ewald.[9,10]  As explained by Ewald, BSC conducted a

_____

    [9] Although the professional land surveyor who stamped and signed the plan no longer worked for BSC and did not testify,

survey of the present conditions of the area at issue.  It then superimposed several historic maps on that plan, including maps from 1819, 1832, and 1859.  (None of the historic maps show a seawall in or near the location of the seawall-walkway at issue.)  BSC determined that the 1819 map entitled, "Plan of Sandy Bay Pieres Taken by William Saville Surveyor," which clearly depicts the high water mark, most closely aligns with current landmarks.  When superimposed on the present location of the seawall-walkway, the 1819 map places the high water mark landward of the seawall-walkway.

b.  <u>Plaintiff's expert</u>.  The plaintiff's case rested primarily on the testimony of a coastal geologist, Erich Gundlach.[11]  Gundlach pointed to the 1813 deed and its description of a 106-foot-long seawall "by the Sea Shore."  He

---

Ewald assisted in creating the plan and drafting the supporting documentation under the supervision of the surveyor who signed it.  By the time Ewald testified before the administrative magistrate, Ewald had become a professional surveyor.  The administrative magistrate noted that "[a]lthough this reduces the weight I ascribe to Ewald's testimony, it does not render the testimony incompetent."

[10] The department presented the testimony of Alex Strysky, but the administrative magistrate found that on cross-examination Strysky appeared confused about benchmarks and distances.  The commissioner did not rely on Strysky's testimony other than to note his testimony that seawalls have been constructed seaward of the high water mark elsewhere in Rockport and Boston.

[11] The plaintiff also presented the testimony of a professional surveyor, Richard Loud.

concluded from this deed reference and the similar length of the seawall-walkway, which he measured to be 108 feet, that the seawall described in the 1813 deed is the seawall-walkway at issue in this case. He contended that the seawall-walkway would have been placed at the high water mark because seawalls constructed around 1813 were not intended to withstand wave action. Thus, he concluded that the high water mark when the seawall-walkway was constructed had to have been at the seaward base of the existing seawall-walkway. While Gundlach originally opined that the 1819 and 1832 maps do, in fact, show the seawall-walkway, the administrative magistrate noted that Gundlach opined that the seawall-walkway's absence from the 1819 map is a further indication that it is landward of the high water mark because the 1819 map was focused on proposed construction in the harbor and, if the seawall-walkway had been seaward of the high water line, it would have been shown.

The only geological evidence Gundlach offered to support his position came in the form of answers to questions posed by the administrative magistrate. Gundlach testified that the seawall-walkway and the retaining wall were built differently. He testified that ninety percent of the seawall-walkway is constructed of the same stones as the wharfs, suggesting it is about the same age. Gundlach further testified that the seawall-walkway is comprised of "large diorite, granite diorite

blocks" and that the seawall-walkway is four and one-half to five feet high, 108 feet long, and approximately three feet thick. He also noted that it is not possible to see what is inside the seawall due to the concrete walkway.

Gundlach testified that the retaining wall was not made of the same blocks as the seawall-walkway; he described the retaining wall as "quite old [and made of] large . . . angular blocks [that are] more disjointed . . . [and] not nicely in place . . . [with] different rocks [of] different ages." He testified that the retaining wall was about sixty to seventy feet wide in front of the Pool property and that it continues onto neighboring properties with some new and some old sections. There was no evidence as to whether the wall was designed to be or functioned as a retaining wall, rather than a former seawall or a boundary for the original Pool lot.[12]

Gundlach opined that the 1819 map was a preliminary plan of the wharfs and that, although the high water mark is accurate,

---

[12] Gundlach pointed to two maps from 1924 and 1925 which, he stated, "show a single seawall and separate landward retaining wall that extends only on [the] historic Pool[] property and not across the entire seafront." He also suggested the retaining wall cannot be the historic seawall because it was not shown on a 1925 plat survey of an adjacent property and, therefore, was built after 1925. He did not reconcile this conclusion with either his testimony that the retaining wall is "quite old" or with the 1813 deed reference to the "corners" of the 106-foot-long seawall, suggesting the seawall referred to in the deed similarly does not continue past the corners of the property reserved by Pool.

the map is inaccurate as to the structures as they had not yet been built. He did, however, submit a plan overlaying current conditions on the 1819 map and depicting the high water mark seaward of the seawall-walkway in support of his position.

5. <u>Administrative magistrate's and commissioner's decisions</u>. The administrative magistrate rejected BSC's reliance on the 1819 map as he concluded that it was a preliminary plan and not "the kind of evidence that reasonable people are accustomed to rely on in the conduct of serious business affairs." See 310 Code Mass. Regs. § 9.02. He concluded that Gundlach offered a reasonable basis for his opinion "that the existing seawall[-walkway] was built in an era when seawalls were built at high water," and adopted Gundlach's conclusion that the seawall-walkway was constructed landward of the high water mark.

The commissioner, on the other hand, deemed Gundlach's conclusion that the seawall-walkway was built at the high water mark conclusory due to the absence of testimony related to "the current high water mark in relation to the seawall, soil logs which could show whether there is fill material behind the seawall, or other support." In contrast to Gundlach's opinion, the commissioner noted that the department's witness, Strysky, had testified that there were seawalls in Rockport built seaward of the high water mark. Moreover, the commissioner noted

discrepancies with current conditions and the plan submitted by Gundlach, finding that on all other plans, the length of the L-shaped Lumber Wharf was approximately three times the arm but that Gundlach had depicted the length as only two and one-half times the arm.  Given this discrepancy, the commissioner did not credit Gundlach's placement of the historic high water mark on his plan.

In addition, the commissioner found that Gundlach's opinion that the seawall-walkway was built at the high water mark and that, therefore, the seaward side of the seawall-walkway forms the historic high water mark was based almost exclusively on Gundlach's conclusory premise that seawalls generally were built at the high water mark around 1813.  The commissioner reasoned that "[t]his [premise] requires factual support as to how [it] applies to this site, as there is no testimony related to the current high water mark in relation to the seawall[-walkway], soil logs which could show whether there is fill material behind the seawall[-walkway], or other support.  While it is possible that the seawall[-walkway] was indeed built at the high water mark and has remained at the high water mark for more than 250 years, the general [premise] that seawalls are built at the high water mark is insufficient to establish that fact or to support the [plaintiff's] direct case."

The commissioner credited BSC's plan, which was based on the 1819 map and current conditions, reasoning that the regulations require use of historic surveys and plans rather than the position of existing structures to determine jurisdiction.  See 310 Code Mass. Regs. § 9.02.  While acknowledging that the 1819 map is not without ambiguity in regard to shoreline features, the commissioner concluded that it clearly depicts high water marks and aligns most closely with current conditions.

Discussion.  1.  Standard of review.  "Under G. L. c. 30A, § 14(7), we review an agency's decision to determine whether it was not supported by substantial evidence, was arbitrary or capricious, or was otherwise based on an error of law."  Ten Local Citizen Group v. New England Wind, LLC, 457 Mass. 222, 228 (2010) (Ten Local Citizen Group).  "This standard is highly deferential to an agency and requires 'according "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it."'"  Ibid., quoting from Friends & Fishers of the Edgartown Great Pond, Inc. v. Department of Envtl. Protection, 446 Mass. 830, 836 (2006).  "In determining whether there is substantial evidence to support the department's decision, 'we must carefully consider any evidence in the record that detracts from the agency's conclusion,'"  Ten Local Citizen

Group, supra at 231, quoting from DSCI Corp. v. Department of Telecommunications & Energy, 449 Mass. 597, 606 (2007), bearing in mind that "the party appealing an administrative decision bears the burden of demonstrating the decision's invalidity." Farrell Enterprises, Inc. v. Commissioner of Rev., 46 Mass. App. Ct. 564, 572 n.15 (1999).

2. Issues on appeal. The plaintiff contends that the commissioner failed to accord the proper deference to the administrative magistrate's fact finding that rests on credibility determinations. We disagree. "Under 310 Code Mass. Regs. § 1.01(14)(b), the commissioner determines 'every issue of fact or law necessary to the decision.'" Ten Local Citizen Group, supra at 231. However, it is true that "when the subsidiary findings [of an administrative magistrate] rest on a 'resolution of credibility questions (i.e., that a fact is true because a witness testified to it and that witness is believable), they should be entitled to substantial deference.'" Morris v. Board of Registration in Med., 405 Mass. 103, 111 (1989), quoting from Vinal v. Contributory Retirement Appeal Bd., 13 Mass. App. Ct. 85, 101 (1982). Even so, the commissioner may reject subsidiary findings provided her decision contains "a considered articulation of the reasons underlying that rejection." Morris v. Board of Registration in Med., supra, quoting from Vinal v. Contributory Retirement

Appeal Bd., supra at 101-102.  See Ten Local Citizen Group, supra at 231 ("If the commissioner rejects an [administrative] magistrate's finding of credibility, it must be accompanied by an explanation").

Here, the commissioner detailed the reasons she rejected Gundlach's determination of the historic high water mark.  The commissioner did not find the plaintiff's expert untruthful and did not reject a credibility determination of the administrative magistrate.  Rather, the commissioner found that the expert's approach did not comport with the regulations' focus on historic plans and data rather than existing conditions to determine the historic high water mark.  In addition, she found that some of Gundlach's conclusions were speculative.  "[A]n agency may reasonably reject an expert's opinion . . . where there are flaws in the methodology or assumptions upon which the opinion depends or where the opinion is based upon conjecture or guesswork."  Pollard v. Conservation Commn. of Norfolk, 73 Mass. App. Ct. 340, 350 n.10 (2008).

We agree with the commissioner that the general supposition that seawalls constructed around 1813 generally were built at the high water mark, even if accepted as true, is insufficient to establish that the seawall-walkway in this case was built at the high water mark.  This is particularly true, here, where there are two walls in close proximity to one another and

virtually no or only inconclusive historical evidence as to when each was constructed.  Indeed, the evidence supporting the supposition that the seawall-walkway is the same seawall referred to in the 1813 deed is exceedingly thin.

In his prefiled rebuttal testimony, Gundlach responded to Ewald's contention that the seawall-walkway is not the same seawall mentioned in the 1813 deed by stating only that "[t]he 106 f[ee]t [referenced in the 1813 deed] aligns with the frontage of the Pool[ ] property" and that "[t]here is no historic record of approval of additional seawalls in this area."  The record, however, does not contain approvals of any of the wall structures on the plaintiff's property or other similar construction in the area such that the absence of approvals would render it more likely that the existing seawall-walkway is the same as that referenced in the 1813 deed. Similarly, that the length of the seawall that existed prior to 1813, the corners of which marked the width of Pool's reserved property, is substantially the same length as the existing ten-foot-wide seawall-walkway that connects two subsequently constructed wharfs on adjacent properties proves little. Moreover, at the hearing, Gundlach testified that ninety percent of the seawall-walkway is constructed of the same type of stones as those used in the currently existing wharfs, which, he concluded, indicated they were constructed around the same time.

However, Gundlach asserted that neither wharf existed in 1813 and neither wharf is mentioned in the 1813 deed. Further, neither the 1819 or the 1832 map even depicts Middle Wharf. If the seawall-walkway at issue was constructed at the same time as one or both of the wharfs it connects, it cannot be the same seawall referenced in the 1813 deed. Indeed, Gundlach's description of the quite old retaining wall consisting of disjointed rocks is perhaps more consistent with Pool's efforts, as referenced in the 1813 deed, to "enclose[]" his property.

Even were we to accept as a factual finding that the seawall-walkway at issue is the same or is in the same location as the seawall mentioned in the 1813 deed, that, as the commissioner points out, is not enough to carry the plaintiff's burden. The department's regulations require the department to "presume the historic high water mark is the farthest landward former shoreline which can be ascertained with reference to topographic or hydrographic surveys, previous license plans, and other historic maps or charts." 310 Code Mass. Regs. § 9.02. Nowhere in the department's regulations is it suggested that the location of seawalls, alone, accurately depicts historic high water marks.[13] If this were the case, surely the regulations

---

[13] Further, it is difficult to conceive, as Gundlach speculates, that a map focused on the harbor and proposed wharfs in the harbor that accurately delineates the low and high water

would have included that in the mechanisms delineated for determining the historic high water mark.  Accordingly, we cannot say that the commissioner erred in requiring some historical or geological evidence that the seawall-walkway at issue was constructed landward of the historic high water mark.

Next, the plaintiff argues, in essence, that the commissioner's decision was not based on substantial evidence as it was error to credit the BSC's plan.  It is true that the commissioner's decision largely rests on the plan prepared by BSC.  The plaintiff's surveyor, however, confirmed that the procedures employed by BSC to locate the historic high water mark by overlaying the 1819 map on current conditions were appropriate and that he would have employed similar techniques. In addition, the plaintiff's coastal geologist testified that the high water mark on the 1819 map is indeed accurately placed.

We recognize that both of the plaintiff's experts nonetheless challenge the location of structures in relation to the high water mark as shown on the BSC plan and further question the BSC plan's general reliability, contending the 1819 map is a preliminary plan rather than an "as built" plan and

---

marks would fail to expressly depict a ten-foot-wide seawall along the high water mark if one, in fact, existed.

does not reveal the scale used.[14]  While it is not at all clear to us that the title of the 1819 map, "Plan of Sandy Bay Pieres Taken by William Saville Surveyor," or the map, itself, suggests that it is a preliminary plan, we need not dwell on the issue because the fact is that when superimposed on existing conditions, the wharfs, particularly the adjacent Lumber Wharf, line up very closely.  Further, HAG's surveyor testified that the minor inconsistencies would not change the location of the high water mark shown on the 1819 map or its relation to the wharfs.

The plaintiff's argument that any inconsistencies render the 1819 map unreliable is unavailing.  While the plaintiff's surveyor suggests that the map is unreliable because we cannot travel back in time to evaluate the work, that rationale would apply to any historic map.  The department, by regulation, has determined that reliance on historic maps is appropriate.  See 310 Code Mass. Regs. § 9.02 ("the Department shall presume the historic high water mark is the farthest landward former shoreline which can be ascertained with reference to topographic or hydrographic surveys, previous license plans, and other historic maps or charts").  Accordingly, based as it is on expert testimony comparing the 1819 map with current conditions,

---

[14] Despite the absence of a scale, the commissioner was able to identify the flaws in Gundlach's plan by using percentages, which should remain the same regardless of scale.

we have little difficulty concluding that the commissioner's decision is based on substantial evidence and we discern no error in the decision of the Superior Court judge upholding the final decision of the commissioner.

Judgment affirmed.